**BOSTON HERALD-TRAVELER COR-
PORATION, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 4915.

United States Court of Appeals
First Circuit.

June 6, 1955.

Frank W. Crocker, Boston, Mass., with whom Levin H. Campbell, III, and Ropes, Gray, Best, Coolidge & Rugg, Boston, Mass., were on brief, for petitioner.

Elizabeth W. Weston, Atty., Washington, D. C., with whom David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and William J. Avrutis, Atty., Washington, D. C., were on brief, for respondent.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Petitioner, seeking in this proceeding to have us set aside an order of the National Labor Relations Board issued on December 21, 1954, is a Massachusetts corporation engaged in publishing a daily morning, a daily afternoon, and a Sunday newspaper. Since 1936 its editorial, commercial, advertising and maintenance employees, exclusive of certain executives, having been determined an appropriate bargaining unit, have been represented by the charging union, Newspaper Guild of Boston, Local 32, an affiliate of the American Newspaper Guild, CIO. Relations between the petitioner and the Union have generally been good, and contracts have been successfully negotiated each year since 1936. Such negotiations are handled by the Guild negotiating committee comprised of Union officials and employees of most of the Boston newspapers.

Beginning with the negotiations for the 1952 collective agreement, a dispute arose between petitioner and the Union concerning the petitioner's duty to furnish the Union individualized data with respect to employees' job classifications, dates of employment, salaries, and commissions. Retreating from an initial refusal, the petitioner furnished some of the information requested but in anonymous breakdowns, and has steadfastly declined to link classification and salary data with the names of individual employees. Pursuant to an unfair practice charge filed by the Union, the Board on January 27, 1953, ordered the petitioner

to furnish "wage data concerning work classifications and salaries". 1953, 102 N.L.R.B. 627, 629. When the Board petitioned for enforcement, this court construed the order as not requiring the linking of employees' names with other data and enforced it on this basis. N. L. R. B. v. Boston Herald-Traveler Corp., 1 Cir., 1954, 210 F.2d 134.

In negotiating for a 1954 collective agreement the Union continued to press its demand for linked data, and on March 22, 1954, the Union filed an unfair labor practice charge against petitioner alleging a violation of §§ 8(a) (1) and (5) of the National Labor Relations Act, 29 U.S. C.A. § 158(a) (1, 5). On April 16, 1954, a collective agreement for 1954 was entered into.

A hearing was had before a trial examiner who held the charge was substantiated by the evidence and recommended that petitioner be ordered to cease and desist from refusing to bargain collectively and to furnish the Union linked data for the year 1953 or for such other period as might be mutually agreed upon. He found that there are some 500 employees in the unit and approximately 100 job classifications, from errand boys, clerks and janitors to reporters and editorial writers. The collective agreement provided minimum salary rates within classifications, with minimum periodic increases but no maximum rates. Article II, § 6 of the 1953 and 1954 agreements provided: "Nothing in this contract shall prevent employees from bargaining individually for pay increases in excess of the weekly minimum established herein." Approximately 20 per cent of all employees in the unit received salaries or commissions above the minimum in their respective classifications. Petitioner has furnished the Union a schedule listing the number of employees in each classification at various salary levels or in stated salary ranges.[1] (By later amendment of the schedule of disclosure, employees who had been grouped within salary ranges were shown at specific sala-ries but still without individual identification.)[2] Petitioner also furnished a list of commissions paid to advertising solicitors consisting of lists of dollar amounts in four categories of solicitors, unlinked to employees' names.

The examiner did not consider the Union's claim that linked information was necessary for policing the contract, since the information had not been requested for this purpose. But the examiner agreed with the Union's contentions that the information was necessary for bargaining on merit increases, pensions, and commissions. With respect to merit increases, he relied on testimony that the Union had bargained for individual employees to obtain such increases and that the individualized information was necessary for the development of comparative standards. With respect to pensions he found that while petitioner had agreed to furnish detailed individual information to its own actuary for the preparation of a pension plan to be discussed in future contract negotiations, the Union itself properly could utilize such information in developing an alternative plan. He found that the data was relevant as to commissions because the Union could properly seek to bargain concerning the bases for payments and methods of computation. He rejected petitioner's contention that it could refuse to furnish the information because of its confidential nature and petitioner's desire to prevent pirating of key employees by competitors.

The Board's Decision and Order differs from the trial examiner's Intermediate Report in the following respects: Petitioner argued that the trial examiner's conclusions with respect to the relevance of the linked information for bargaining over individual merit increases were erroneous, since such bargaining would be conducted by a separate committee which handles grievances and not by the negotiating committee for whom the information had been requested. The Board held that, assuming the validity of this

---

1. E. g., Columnists—4 from $135.25 to 210.00.

2. E. g., Columnists—1 @ $135.25, 1 @ 157.75, 1 @ 170.25, 1 @ 210.00.

position, the wage information might well be useful to the negotiating committee in determining whether to bargain for a change in the merit system or for wage increases in specific job categories. The disposition of this point is indicative of the main thrust of the Board's decision. Relying on its previous decisions, some of which have been enforced by the courts, the Board stated a general rule that, in effect, linked wage data is always presumptively relevant to collective bargaining. The requesting union need not show the precise relevance of the information to particular issues under discussion. Such a rule is necessary because "it is virtually impossible to tell in advance whether the requested data will be relevant except in those infrequent instances in which the inquiry is patently outside the bargaining issue." N. L. R. B. v. Yawman & Erbe Mfg. Co., 2 Cir., 1951, 187 F.2d 947, 949. The Board rejected as hindsight the petitioner's argument that the contract eventually negotiated did not necessitate information beyond that which had been furnished to the Union. It suggested that full disclosure might have revealed inequities in the wage structure about which the Union might have made demands. While the Board stated that it agreed with the findings of the trial examiner that the linked data was relevant to bargaining in this case, it apparently did so upon this basis of probable or presumptive relevance, without discussing the trial examiner's specific findings of relevance (e. g., as to future pension negotiations). The Board rejected petitioner's justification of its refusal to disclose confidential information because the preference of individual employees for secrecy is speculative and, if existent, must yield to the interests of the majority of the employees, and because the

danger of pirating by competitors is outweighed by the necessity for fully informed bargaining.[3] The Board ordered the petitioner to cease and desist from refusing to bargain, and affirmatively ordered petitioner upon request to furnish linked information to the Union.

Pursuant to § 10(f) of the National Labor Relations Act, 61 Stat. 148, 29 U. S.C.A. § 160(f), the employer has filed this petition to set aside the Board order on the grounds (1) that it was error to find an unfair labor practice "without considering the specific relevancy of the requested information to actual bargaining between the parties; and (2) that the record does not disclose that the linked names and salaries were relevant to bargaining between the parties." In an answer filed by the Board, it requests us to enforce its order, which of course we have jurisdiction to do, under § 10(f) of the Act, as amended, 61 Stat. 148.

In the instant case petitioner concedes that the matters with respect to which the Board found the linked data might have been useful are proper and even mandatory subjects of bargaining under the Act. E. g., J. H. Allison & Co., 1946, 70 N.L.R.B. 377, enforcement granted 6 Cir., 1948, 165 F.2d 766, 3 A.L.R.2d 990, certiorari denied 1948, 335 U.S. 814, 69 S.Ct. 31, 93 L.Ed. 369 (merit increases); Inland Steel Co., 1948, 77 N.L.R.B. 1, enforcement granted 7 Cir., 1948, 170 F. 2d 247, 12 A.L.R.2d 240, certiorari denied 1949, 336 U.S. 960, 69 S.Ct. 887, 93 L.Ed. 1112 (pension plan); Developments in the Law—The Taft-Hartley Act, 64 Harv.L.Rev. 781, 826–27 (1951). Cf. W. W. Cross & Co., v. N. L. R. B., 1 Cir., 1949, 174 F.2d 875 (group insurance).

In administering the Act, the Board has for some time necessarily inquired into the processes of collective bargain-

---

3. It appears that the salaries of the employees in whom other newspapers would be most interested are already substantially disclosed, since it is probable that each of the highly paid editorial and business personnel could be identified from his ranking in the data which has been furnished. It is certainly no more than conjectural that disclosure of the salaries of the large portion of employees in the bargaining unit who are paid lower salaries, with smaller variations within groups, and hence are not individually identifiable from the data already furnished, would result in attempts by other newspapers to hire them.

ing. It has done so with respct to the issue raised in the instant case, at least since 1942. Aluminum Ore Co., 1942, 39 N.L.R.B. 1286, 1296–1297, enforcement granted 7 Cir., 1942, 131 F.2d 485, 147 A.L.R. 1. In dozens of cases it has ordered the employer to furnish the union detailed data with respect to individual salaries, merit increases, bonuses, dates of employment, job classifications, and the like. E. g., J. H. Allison & Co., supra; National Grinding Wheel Co., Inc., 1948, 75 N.L.R.B. 905, 935–937; Dixie Mfg. Co., Inc., 1948, 79 N.L.R.B. 645, 658, enforcement granted 6 Cir., 1950, 180 F.2d 173; Vanette Hosiery Mills, 1948, 80 N.L.R.B. 1116; General Controls Co., 1950, 88 N.L.R.B. 1341, 1343, 1354–1355; Yawman & Erbe Mfg. Co., 1950, 89 N.L.R.B. 881, enforcement granted 2 Cir., 1951, 187 F.2d 947; B. F. Goodrich Co., 1950, 89 N.L.R.B. 1151. Such orders have been issued in disputes between publishers and unions representing bargaining units of the same heterogeneous nature as the unit involved here. E. g., E. W. Scripps Co., 1951, 94 N.L.R.B. 227; The Hearst Corp. (Boston Record-American-Advertiser Division), 1953, 102 N.L.R.B. 637; Post Publishing Co., 1953, 102 N.L.R.B. 648; The Item Co., 1954, 108 N.L.R.B. No. 227, enforcement granted 5 Cir., 1955, 220 F.2d 956. Petitioner concedes the correctness of the general rule enunciated in these cases. He argues, however, that they support orders only where the requested data was found to be specifically relevant to negotiations and that the Board departed from this standard in Whitin Machine Works, 1954, 108 N.L.R.B. No. 223, enforcement granted 4 Cir., 1954, 217 F.2d 593, 594, certiorari denied 1955, 349 U.S. 905, 75 S.Ct. 583. Petitioner maintains that the rationale of the Whitin case, upon which manifestly the Board premises its order in the instant case, that it is " 'sufficient that the information sought by the union is related to the issues involved in collective bargaining, and that no specific need as to a particular issue must be shown' ", is an unwarranted enlargement of the duty to bargain collectively.

This case could be disposed of solely upon the question of relevance—we are satisfied that the trial examiner's conclusion that the requested information was relevant is adequately supported by the whole record. Indeed petitioner in its brief seems to concede that some further breakdown of information should be given the Union so that it might utilize its own actuary in the preparation of an alternative pension plan. However, petitioner argues that the Union's actuary would need to know individual employees' ages, length of service, and salaries, but not their names. This is too nice a distinction; certainly if the Union were furnished a breakdown of reporters showing that X is 50 years old, has been in the petitioner's employ for 22 years, and makes $146 a week, the Union would have no difficulty identifying X. It would then appear that the question becomes whether the Board order should be modified so as to direct petitioner to furnish data identified by symbol and not by name. To do so would not in any substantial manner affect the outcome.

It appears that in the newspaper business merit increases are largely a matter for management determination. Yet a breakdown of Newspaper Guild contracts set forth in Cox and Dunlop, Regulation of Collective Bargaining by the National Labor Relations Board, 63 Harv.L.Rev. 389, 409 note 71 (1950), illustrates the range of contract provisions in that industry. Some of the contracts provide for notification to the Guild of increases, and a few specifically provide that the Guild may bargain for individual merit increases. It is certainly possible that, upon review of the requested data, the Union in the instant case might have sought such provisions, or attempted more substantial changes in the wage system. The same is true of commissions paid to members of the bargaining Union. Petitioner argues that the contract negotiated for 1954 did not change previous merit increase provisions, and

that therefore the requested data was not relevant to the contract entered into. This argument has been advanced in most of the prior cases concerning this question and has been rejected for the very good reason that it would tend to postpone negotiations and undermine bargaining until disputed issues were resolved by the Board and the courts. Findings of relevance of no greater specificity than those made here have been adopted by the courts in previous cases enforcing Board orders.

■■ However, we think it would be unwise not to consider the statutory validity of the concept of the presumptive relevance of individualized wage data to collective agreement negotiations. Perhaps it is true that the Board first specifically enunciated this doctrine in the Whitin Machine Works case, supra, yet it seems to have been adopted as an implied premise in the earlier Board decisions and court decisions enforcing Board orders. Although the employers almost uniformly have contested the relevance of the requested data, the Board and the courts have found relevance in generalized avowals by the charging union that the information was necessary for the purpose of policing existing contractual provisions which made merit increases a matter for bargaining between the employer and individual employees or for the purpose of negotiating with respect to minimum wage rates or merit increase mechanisms. It has apparently been considered enough to determine that the union might have found it necessary or desirable to make demands for changes in existing systems, should evidence of inequities have been developed upon review of the data which management refused to furnish. This practice is illustrated in Yawman & Erbe Mfg. Co., 1950, 89 N.L.R.B. 881, 882–83. The order in that case was enforced by a Per Curiam decision of the Second Circuit, 187 F.2d 947, which served as a springboard for the Whitin decision (surprisingly it is not cited in the Whitin case, which relies on N. L. R. B. v. Leland-Gifford Co., 1 Cir., 1952, 200 F.2d 620, 624, in which,

however, this court did not have to focus sharply on the question, since the relevance of the requested data was not disputed). Although the Second Circuit approved the Board's finding that certain data was clearly relevant, it went on to observe:

"Indeed, we find it difficult to conceive a case in which current or immediately past wage rates would not be relevant during negotiations for a minimum wage scale or for increased wages.

"Since the employer has an affirmative statutory duty to supply relevant wage data, his refusal to do so is not justified by the Union's failure initially to show the relevance of the requested information. The rule governing disclosure of data of this kind is not unlike that prevailing in discovery procedures under modern codes. There the information must be disclosed unless it plainly appears irrelevant. Any less lenient rule in labor disputes would greatly hamper the bargaining process, for it is virtually impossible to tell in advance whether the requested data will be relevant except in those infrequent instances in which the inquiry is patently outside the bargaining issue." 1951, 187 F.2d 947, at page 949.

We think the best statement of reasons for the necessity of the doctrine of presumptive relevance is given by Chairman Farmer, concurring, in the Whitin case:

"I concur in this decision for I think that a clear-cut rule relating to this issue is desirable. The multiplicity of unfair labor practice proceedings brought to the Board only because of disagreement between union and employer over the precise form and details of wage rate information sought requires clear understanding of the scope of the employer's obligation. Knowledge of the method of payment and of the earnings of the employees represented by a union is a necessary ingredient in

the amalgam of factors in the collective bargaining process, if the bargaining is to proceed without interruption and lead to harmonious and peaceful industrial relations. The exact phrasing by which it is requested, or the specific reason for requesting it, if any, are not controlling. In the event that other cases of this kind reach the Board hereafter, therefore, I will give less weight to disputes over the relationship of the material sought to bargaining issues, and will give greater significance to the nature of the knowledge sought and its general materiality in the entire collective bargaining process.

"I would not require that the union show the precise relevancy of the requested information to particular current bargaining issues. It is enough for me that the information relate to the wages or fringe benefits of the employees. Such information is obviously related to the bargaining process, and the union is therefore entitled to ask and receive it.

"My interpretation of the employer's obligation under Section 8(a)(5) in this respect, of course, also presupposes that the bargaining agent, in this area as in all others, will seek the wage rate information as a good faith act in the discharge of its duty as the representative of the employees. I would, therefore, hold that, short of evidence that union requests for wage data are used as an harassing tactic and not in good faith effort to secure pertinent bargaining information, the employer has a continuing obligation to submit such data upon request to the bargaining agent of his employees. This does not, of course, preclude the employer from requiring the union to enter into reasonable arrangements for the compilation of the requested data including provisions for bearing the additional cost to the employer of furnishing the requested information. I am convinced, after careful consideration of the import of the problem on the collective bargaining process, that this broad rule is necessary to avoid the disruptive effect of the endless bickering and jockeying which has theretofore been characteristic of union demands and employer reaction to requests by unions for wage and related information. The unusually large number of cases coming before the Board involving this issue demonstrates the disturbing effect upon collective bargaining of the disagreements which arise as to whether particular wage information sought by the bargaining agent is sufficiently relevant to particular bargaining issues. I conceive the proper rule to be that wage and related information pertaining to employees in the bargaining unit should, upon request, be made available to the bargaining agent without regard to its immediate relationship to the negotiation or administration of the collective bargaining agreement." 108 N.L.R.B. No. 223 at 6–7. The majority stated that in this respect they agreed with Chairman Farmer's statement. Id. at 3.

The foregoing statement is consonant with and best calculated to effectuate the purposes of the Act. We therefore join with the Fourth and Fifth Circuits in approving the Board's construction in this respect of the statutory duty to bargain.[4] The position taken by the Board in the Whitin case and in the present one certainly is preferable to the generalized findings of relevance made in the earlier cases. It needed no great intellectual exercise for the Board to find relevance, and the courts to approve such finding, under the standards prevailing in those cases.

4. N.L.R.B. v. Whitin Machine Works, 4 Cir., 1954, 217 F.2d 593, certiorari denied 1955, 349 U.S. 905, 75 S.Ct. 583; N.L.R.B. v. The Item Co., enforcement granted 5 Cir., 1955, 220 F.2d 956. See also N.L.R.B. v. Yawman & Erbe Mfg. Co., 2 Cir., 1951, 187 F.2d 947.

Requiring the Board to abandon the Whitin rule would be a hollow act, and by avoiding the necessity of specific findings of relevance the statutory purposes will be effectuated and the business of the Board and the courts in this area will be simplified, without practical effect upon the parties.

A decree will be entered enforcing the order of the Board.