WESTERN MASSACHUSETTS ELEC-
TRIC COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

WESTERN MASSACHUSETTS ELEC-
TRIC COMPANY, Respondent.

Nos. 78–1099, 78–1105.

United States Court of Appeals,
First Circuit.

Argued Sept. 11, 1978.
Decided Dec. 18, 1978.

Dumbauld, District Judge, sitting by designation, dissented and filed opinion.

**44**

R. Malcolm Graham, Boston, Mass. with whom Melvin Pierce, Frank Giso, III, and Peabody, Brown, Rowley & Storey, Boston, Mass., were on brief, for Western Massachusetts Elec. Co.

Peter M. Bernstein, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Assoc. Gen. Counsel, Elliott Moore, Deputy Assoc. Gen. Counsel, and Susan Tepper Papadopoulos, Atty., Washington, D. C., were on brief, for the N. L. R. B.

Before COFFIN, Chief Judge, DUMBAULD,* Senior District Judge, and CAMPBELL, Circuit Judge.

LEVIN H. CAMPBELL, Circuit Judge.

These are cross petitions for enforcement, and for review, of an order of the National Labor Relations Board directing Western Massachusetts Electric Company to turn over certain information to Local 455, International Brotherhood of Electrical Workers, AFL–CIO (the "Union").[1] It was the Board's conclusion, contrary to that of its administrative law judge, that the Company's withholding of the information constituted an unfair labor practice, in that it amounted to a refusal "to bargain collectively with the representatives of [its] employees" in violation of § 8(a)(5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5).[2] The Company was ordered to turn over the disputed information, post compliance notices, and cease and desist from like or related practices.

The facts were stipulated. The Company, an electric utility, began in mid-1976 to alter and revamp the routes of its meter readers. The Union responded by requesting a copy of the guidelines (or "formula") being used in the rerouting, and the Company refused. Exactly what the "formula" consists of, and its significance to the rerouting process, is unclear. It can be surmised from the stipulation to consist of a study conducted by the Company's parent, early in 1976, "with a view toward developing another prescheduling system for meter reading supervisors." The stipulation goes on,

> "The underlying idea of the system was that by properly scheduling and coordinating the routes, some of which were fragmented and/or improperly sequenced, the meter reading could be accomplished more efficiently."

It was stipulated that "the guidelines have only been used for a starting point in laying out the initial routes."

The stipulation further provided that in the past a new route would be established when warranted by a supervisor familiar with the route. The supervisor would "put together a series of accounts which represented a full day's work," consult with the assigned meter reader, and make a field survey to determine if the route was too short or long. The stipulation also states that the Company earlier had hired Remington Rand Corporation, in 1955, to implement a system of prescheduling routes that Remington Rand had devised.

In demanding to see the formula, the Union stated that it needed to do so in order "to determine whether or not the production standard was reasonable and based on normal conditions and an approved method of reading by a regular meter read-

---

* Of the Western District of Pennsylvania, sitting by designation.

1. The Board's decision and order is reported at 234 NLRB No. 19.

2. The Board also concluded that the Company violated § 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1).

er." The Union further stated, "[I]t appears that the rerouting has resulted in unusually long meter reading routes." Finally, the Union stated that the information was necessary in order to enable it to represent its members properly given that the Company had informed the Union on several prior occasions that once the rerouting was completed, there might be layoffs of Union members.[3]

The Company's refusal to divulge the information was based on the management rights clause of the collective bargaining agreement,[4] which, the Company contended, relieved it of any obligation to negotiate with the Union concerning the alteration of the meter reading routes. The Company pointed to its long-standing practice of rerouting meter reading routes from time to time and asserted that "the Union has never been involved in determining methods used in arriving at proper assignments." In addition, the stipulation states that "[T]he Company has not yet disciplined a meter reader for failure to complete his assigned route due to additional meters being added to a route pursuant to the guidelines . .. Finally, the Company has not yet sought to justify a position taken during any grievance by appealing to the guidelines."

The Company and Union have bargained collectively for 35 years, and at all times material to this case there has been in effect between them a collective bargaining agreement executed July 1, 1976. The agreement, according to the stipulation, "provides only for hourly wage rates; it does not provide for piece rates nor does it contain an incentive wage system . . . job performance standards or even job descriptions."

Relying on *General Aniline and Film Corp.,* 124 NLRB 1217 (1959), the ALJ concluded that the Union had failed to demonstrate that the guidelines in the formula were relevant or necessary for it to administer the terms of the contract or to represent its members properly. The demand for information was said to be "based upon an alleged necessity which was more general and theoretical than immediate and practical," *citing Kroger Co. v. NLRB,* 399 F.2d 455, 457 (6th Cir. 1968).

The Board disagreed. It found that "there is a significant and substantial relationship between [the Company's] use of the formula to effect a restructuring of its entire meter-reading system and the working conditions of employees [*i. e.,* meter readers] represented by [the Union]." 234 NLRB No. 19, slip op. at 4. The Board felt the meter readers had an immediate interest in a management initiative that affected their workloads by extending the length and composition of their routes and might cause some to be laid off. The Board distinguished the *General Aniline* case, upon which the ALJ had relied, as relating to a report that was "solely for the convenience of supervisors and concerned neither the rearrangement nor the elimination of jobs." *Id.* at 5 n. 8. The Board thought it unimportant that no grievance had been yet filed: it said a union is entitled "to all information that is necessary for a labor organization properly and intelligently to perform its duties in the general course of bargaining." *Id.* at 5. Thus it indicated that the information should be supplied if needed to assist the Union in deciding whether to institute a grievance or use oth-

---

**3.** It was stipulated that the Company had temporarily enlarged its force of meter readers in 1974 when it went to a system of monthly (rather than some bi-monthly) meter readings, with the intention—of which the Union was "clearly informed"—of cutting back on some of these jobs once a more efficient system of routes could be established.

**4.** Section IV(4) of the agreement provides:
"(4) The Union agrees, for itself and the Employees, not to hinder or interfere with the management of the Employer in its sever-

al departments, *including the assignment of work, the direction of working forces,* the right to hire, suspend or discharge for proper cause, to transfer Employees to work for which they are better suited and to furlough Employees because of lack of work or for other good and sufficient cause, but in the exercise of these responsibilities in management the Employer agrees that it will not discriminate against any member of the Union." [Emphasis added.]

er policing tools under the contract, or if useful to guide the Union in future contract negotiations.

■ We affirm the Board on the facts of this case. The duty to bargain in good faith requires an employer to furnish information that the bargaining agent needs for the proper performance of its duties. *NLRB v. Acme Industrial,* 385 U.S. 432, 435–36, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967); *Teleprompter Corp. v. NLRB,* 570 F.2d 4, 8 (1st Cir. 1977). This obligation extends to the union's need for information during the administering and policing of a contract as well as during contract negotiations. *NLRB v. Acme Industrial,* 385 U.S. at 435–36, 87 S.Ct. 565; *Puerto Rico Telephone Co. v. NLRB,* 359 F.2d 983, 986 (1st Cir. 1966).

■ The Board in the instant case could infer from the stipulation that the formula—whatever its precise function—played some role in the restructuring of routes, and could have the effect of augmenting employee workload.[5] The Board could also determine from this record that the formula would have a tendency to cut

back on the number of meter readers. That was, indeed, virtually undisputed. It may be, as the Company contends, that both of the above results are perfectly consistent with the proper exercise of management rights under the contract and with the prior history of the Company's rerouting. That is not the question here, however. As the Supreme Court said in *Acme,* 385 U.S. at 437, 87 S.Ct. at 568,

> "[W]hen it ordered the employer to furnish the requested information to the union, the Board was not making a binding construction of the labor contract. It was only acting upon the probability that the desired information was relevant, and that it would be of use to the union in carrying out its statutory duties and responsibilities. This discovery-type standard decided nothing about the merits of the union's contractual claims."

The question here is merely whether disclosure of the formula would be of probable relevance to the discharge of the Union's statutory duty and responsibilities. If so, it must be disclosed.[6]

---

5. The Company has never denied that the formula plays some role. Given the Union's assertions, one would have expected outright denial, rather than equivocation if the Company—which alone has access to the inside information—believed that the formula was immaterial to the rescheduling. Instead the Company stipulated that it "has not yet disciplined a meter reader for failure to complete his assigned route due to additional meters being added to a route pursuant to the guidelines," suggesting that the formula may well have effected some increase in the number of meters to be read. The Company also stipulated that "the guidelines have only been used for a starting point in laying out the initial routes"—again a backhanded concession that the guidelines play some, if not the decisive, role.

6. Judge Dumbauld argues in his able dissenting opinion that the study (*i. e.,* "formula") will only tell the Union *why* the new routes were thought preferable, and will add nothing to what a member can learn, by walking a new route, as to its burdens on him. We do not agree. First, the record indicates that only part of the rerouting had been accomplished when the formula was requested. The Board could infer that had the information been provided promptly, it would have helped the Union anticipate the configuration of routes yet to come, hence better gauge their impact on members.

There is nothing in the record to show, as the dissent suggests, that the rerouting "has now probably been put fully into effect." Even if it has, the question before us is the situation when presented to the Board: an employer may not withhold information until it is stale and then argue that it is no longer relevant. Secondly, it is speculative that the formula merely reflects a rationale rather than concrete details from which future routing plans can be ascertained. The Company, alone, is privy to the formula, and the stipulated description of it is so general as to reveal virtually nothing. In the circumstances, it seems fairest to assume the most rather than the least. Under the "discovery-type standard" referred to in *NLRB v. Acme Industrial,* 385 U.S. at 437, 87 S.Ct. 565; see *Boston Herald-Traveler v. NLRB,* 223 F.2d 58 (1st Cir. 1955), we think the Union has made a sufficient threshold showing of probable relevance for it to receive the information and itself determine its significance. See note 5, *supra.*

As we point out later in this opinion, the Company has not argued that release of the information presents particular perils or hardships, nor has it identified and sought to withhold portions that relate exclusively to management concerns of a possibly confidential nature. We might be more sympathetic had the Company made a proffer or showing along these lines. *See infra.*

This is not a case where a union is seeking information of a type usually treated as outside the scope of its normal bargaining needs, such as profitability data, see *Teleprompter Corp. v. NLRB,* 570 F.2d at 8–9. Profitability and cost data is ordinarily not available to the union except in special circumstances such as when management itself has placed the information in contention by "pleading poverty" or the like. *Id.* The information here, on the other hand, bears on the length and difficulty of the employees' assigned tasks and thus relates to their workload, which is a mandatory subject of bargaining, *Gallenkamp Stores v. NLRB,* 402 F.2d 525, 529 n. 4 (9th Cir. 1968); *NLRB v. Bonham Cotton Mills,* 289 F.2d 903 (5th Cir. 1961); *Irvington Motors,* 147 NLRB 565 (1964), *enforced,* 343 F.2d 759 (3d Cir. 1965); *Beacon Piece Dyeing & Finishing Co.,* 121 NLRB 953 (1958). Information so relating to a mandatory subject of bargaining must usually be made available when sought by the bargaining representative for a proper purpose. *Teleprompter Corp. v. NLRB,* 570 F.2d at 8.

This is not to say that this is an utterly simple case. It is complicated by two factors. First, while the study sought has been shown to have some impact directly upon one of the mandatory subjects of bargaining, it was developed by management to serve ends most often viewed as part of the management function. That fact alone is insufficient reason to withhold the information from a union. It might, however, if combined with other, legitimate management reasons for objecting to disclosure—such as a demonstrated probability of economic injury to the company's business from the disclosure—furnish some basis for protecting an employer by limiting if not denying disclosure. *See American Cyanamid Co.,* 129 NLRB 683 (1960); *cf. Sylvania Electric Products v. NLRB,* 291 F.2d 128, 132 (1st Cir.), *cert. denied,* 368 U.S. 926, 82 S.Ct. 360, 7 L.Ed.2d 90 (1961) (disclosure not required if it would be "unduly burdensome or time consuming"). A shotgun approach to enforced discovery may be inappropriate, at least when dealing with management information of this type as contrasted with wage data, where the union's demonstrated need is relatively slight and management's legitimate reasons for nondisclosure are compelling. *See Kroger Co. v. NLRB,* 399 F.2d 455. Terms such as "presumptively relevant" and the like, *see Teleprompter Corp. v. NLRB,* 570 F.2d at 8; *Boston Herald-Traveler v. NLRB,* 223 F.2d 58, 62–64 (1st Cir. 1955), represent rules of thumb which must not prevent individualized treatment of exceptional cases. There is no statutory rule of disclosure—only the requirement that the employer bargain in good faith. "The inquiry must always be whether or not under the circumstances of the particular case the statutory obligation to bargain in good faith has been met." *NLRB v. Truitt Manufacturing,* 351 U.S. 149, 153–54, 76 S.Ct. 753, 756, 100 L.Ed. 1027 (1956); *see NLRB v. Pearl Bookbinding Co.,* 517 F.2d 1108, 1113 (1st Cir. 1975). An employer is entitled to show that special circumstances justify some protection, just as parties to litigation may be entitled to protective orders in the course of discovery. Be that as it may, no showing has even been attempted, much less made here, indicative of the kind of extraordinary circumstances referred to.

Second, the Company and the ALJ have argued the absence of any ongoing contract negotiations or grievance proceedings to which the information is relevant. The Union's need, said the ALJ, is only "theoretical." But we believe the restructuring of meter reading routes, with its likely impact on the workload of individual employees and potential job loss, provides for more than a theoretical need. The Union has a practical need for information bearing on the Company's plans in this area of operations.

The change in routes is a matter the Union could properly investigate while the collective bargaining agreement was still in effect with a view to possible grievance action or even, though less likely, to mid-term bargaining. The contract between the Company and the Union has an exceedingly broad grievance clause. Any difference or dispute regarding "any mat-

ter" may be processed thereunder.[7] Even though the contract makes no provision regarding job performance standards, it seems probable that complaints about altered workload stemming from the rerouting may be grieved. Were that not so, the Union might, as an alternative, have residual mid-term bargaining rights, under the principle that mid-term bargaining may proceed concerning mandatory subjects that "were neither discussed nor embodied in any of the terms and conditions of the contract." *NLRB v. Jacobs Manufacturing,* 196 F.2d 680, 684 (2d Cir. 1952), *enforcing* 91 NLRB 1214 (1951); *see N L Industries v. NLRB,* 536 F.2d 786, 789 (8th Cir. 1976); *Robertshaw Controls Co., Acro Division v. NLRB,* 386 F.2d 377, 388–89 (4th Cir. 1967). These possible strategies—especially recourse to the grievance procedure—are real enough to give prima facie substance to the Union's inquiry into the Company's route restructuring program, with its plain potential for impact on members.

■■■■ The issue, we repeat, is not whether the Company may under the management rights clause proceed with such a program, but simply whether the interest of the Union and its members is sufficient to give the Union a right of discovery so that it can take any steps it may be permitted to take, under the contract and the law, to safeguard its members' interests. There is no principle that a grievance be filed before the Union may obtain information relevant to assessing and effectively processing a potential grievance. To the contrary, although grievances were filed in that case, the Supreme Court said in *Acme* that a union was entitled to "the opportunity to evaluate the merits of the claim" before proceeding through a lengthy arbitration. 385 U.S. at 438, 87 S.Ct. 565. This is not to say that unions may obtain information having no discernible relevance to any open course of action—a union may not seek information merely to harass, *see Sylvania Electric Products v. NLRB,* 291 F.2d at 132, or if its only materiality is to an issue plainly foreclosed by an existing contract, *cf. NLRB v. Yawman & Erbe Manufacturing Co.,* 187 F.2d 947, 949 (2d Cir. 1951) (disclosure not required if requested information is "patently outside the bargaining issue"). But this is not such a case.[8]

We need not decide whether the possible relevance of the requested information to future contract negotiations—a matter which the Board mentions but as to which the Union and the stipulated record is entirely silent—constitutes a further valid reason in this case for making it available. It is enough that there are apparent mid-term courses of action possibly open to the Union to shield its members from adverse effects of the rerouting, and that the requested information is of probable relevance to assessing and charting those courses.

*The petition for review is denied and the decision of the Board is enforced.*

DUMBAULD, District Judge (dissenting).

In my view the Administrative Law Judge's decision was correct, and preferable to the contrary determination of the Board. Hence I respectfully dissent from enforcement of the Board's order.

---

7. Section XVI of the collective bargaining agreement provides in pertinent part:

"During the term of this agreement, should any difference, dispute, or grievance arise between the Employer and the Union regarding any matter, there shall be no suspension of work, but the same shall be reduced to writing and signed by the person or persons aggrieved, or by the Union, delivered to the Employer by the Business Manager or Assistant Business Manager or Steward of the Union within fifteen (15) days after the basis of the grievance occurs and settled by taking so far as necessary each of the steps hereafter outlined in this Section."

8. It is true that the management rights clause is strong with respect to work assignments, but it is not so conclusive as obviously to forestall the Union from grieving workload issues arising as a result of decisions allowed to management under the clause. It is, of course, neither our function nor the Board's in a case such as this to interpret the contract finally, *see NLRB v. Acme Industrial,* 385 U.S. at 437, 87 S.Ct. 565, but as a threshold matter we cannot say that the management rights clause deprives the Union of any and all functions to which the requested information would be of probable relevance.

Whether meter-reading routes were established (as in the past) by a pavement-pounding supervisor on the company payroll, or whether they were established upon the recommendation of an ivory-tower management theorist higher up in the holding company hierarchy, seems wholly immaterial to the fairness or practicability of the routes established.

Use by management of the study developed by Northeast Utilities Company, the electric company's parent corporation, was a "one shot" transitional measure, occasioned by the company's decision to read all meters every month, which has now probably been put fully into effect.[1] Those recommendations are now *functus officio,* and of no relevance to the union's ongoing functions in connection with collective bargaining or processing grievances.

The union and its members well know *what* routes were established by use of the "think-tank" report. They do not need to know precisely *why* those routes were found desirable by management. Routes so established are subject to change if unsatisfactory. If the routes so set up prove to be too long or burdensome in any way to the union members, they have first-hand knowledge of such facts and are entirely free to complain in the normal way. They do not need to read a report couched in management gobbledygook to know if their feet hurt after an excessive day's work.

The situation would be precisely identical in result with respect to the union's concerns, if the routes had been calculated by computer, or by simply looking at a map, or by applying maxims and techniques remembered from textbooks used in the Harvard Business School, or by consulting a palmreader or soothsayer. Whatever the method employed, it is the actual, objectively observable results of the managerial proposal which affect the union and its members for weal or woe. The historical genesis of such results is immaterial. They are to be evaluated by the union on their merits. In Biblical language "by their fruits (routes) ye shall know them," not by the stages of development experienced by the tree.

The mental processes of management in preliminarily determining what routes were suitable is now merely a matter of past history. It is of only academic concern to the union or its members.

As stated in the Court's opinion, there is no statutory rule of disclosure *per se* (as in an SEC prospectus, for example). The law imposes only the duty to bargain in good faith. An employer fulfills that obligation when it deals fairly with whatever proposals the union may make with respect to work loads or layoffs. "Discovery" procedure is not warranted for its own sake but is appropriate only when reasonably incidental to the process of good faith bargaining. The company here should not be required to furnish the document desired by the union.

---

1. Before October 1974 only commercial users and residential customers using electric heat had monthly meter readings. The decision to read all meters monthly led to a temporary increase in the number of meter readers employed, since the company delayed the rerouting of its entire system to eliminate duplication until after it had installed a new billing procedure. The parent company's study was prepared in January 1976. In November the new routes in the Easthampton area were initiated. The record does not show when, if ever, the entire pattern of new routes was completed.