COMMUNICATION WORKERS OF AMERICA AFL–CIO, LOCAL 1051, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

and

AMERICAN TELEPHONE AND TELEGRAPH COMPANY LONG LINES DEPARTMENT, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 80–1434, 80–1466.

United States Court of Appeals, First Circuit.

Heard Nov. 5, 1980.

Decided March 31, 1981.

Joseph G. Sandulli, Boston, Mass., for Communication Workers of America, AFL–CIO, Local 1051.

Leonard W. Weitz, Bedminster, N. J., with whom Brian M. Kelleher, New York City, was on briefs for American Telephone and Telegraph Company.

Collis Suzanne Stocking, Washington, D. C., Atty., with whom William A. Lubbers, General Counsel, John E. Higgins, Jr., Deputy General Counsel, Robert E. Allen, Acting Associate General Counsel, Elliott Moore, Deputy Associate General Counsel, and Paul J. Spielberg, Deputy Asst. General Counsel, Washington, D. C., were on brief for respondent.

Before COFFIN, Chief Judge, CAMPBELL, Circuit Judge, and JULIAN, Senior District Judge.*

COFFIN, Chief Judge.

The question in these petitions for review is whether an employer may, consistent with its collective bargaining duties, insist that a union copy grievance-related documents by hand rather than by mechanical means. The National Labor Relations Board determined that this practice violated §§ 8(a)(5) and (1) of the National Labor Relations Act and ordered the employer to make photocopies available in future cases at the union's expense. We have consolidated the petitions for review filed by the employer and the union, and the Board's cross-application for enforcement of its order. Our curiosity piqued by the stance of a giant of high technology atavistically insisting on a quill and scroll ritual, we have searched diligently for the underlying justification of law or policy. We have found none.

I

At all relevant times, the American Telephone & Telegraph Company, Long Lines Department (the company) and Local 1051, Communications Workers of America, AFL–CIO (the union) were parties to a collective bargaining agreement, which provided for a multi-level grievance process culminating in arbitration. For many years the company has maintained a policy of refusing to provide, or to permit the union to make, exact copies of grievance-related materials. Instead, the company requires union representatives to handcopy documents in the presence of a supervisor or to take notes while a supervisor reads from the employee's personnel file. The policy was announced in the company's Labor Relations Handbook and reiterated in several "policy letters". One such policy letter created an exception to the "no photocopy" rule if the relevant data were so complex and voluminous that the union could not comprehend the information without a copy. It appears, however, that this standard has never been met to the company's satisfaction. One of the company's district operations managers testified that in 16 years the union had not once been supplied with a photocopy. Two lower level managers explained their understanding of the

---

* Of the District of Massachusetts, sitting by designation.

company policy as: no photocopies for the union "in any case". Time spent copying documents on behalf of the union is compensable by the company only when "clearly incidental to a grievance meeting in progress", although the practice of individual managers varies somewhat.

The Administrative Law Judge (ALJ) considered the "no photocopy" rule as applied to four different grievances.[1] In each case the union's request for photocopies of relevant portions of the employee's personnel file was refused, although the company ultimately offered to make all of the requested documents available to the union for the purpose of handcopying.

Company employees David Gagne and Richard Bennett were each disciplined in June 1978 for poor attendance. The union did not accept the company's offering of handcopying, but pressed its request for copies of the two men's attendance records. Gagne's records covered nine years of employment with the company and consisted of 16 pages of partially encoded forms and 7 pages of comments. Bennett's records covered six years of employment and consisted of 11 pages of forms and 12 pages of comments. The ALJ found that it would have required several hours in each case to handcopy the records, that the material was easily susceptible to errors in copying and that, at least in Gagne's case, the company refused to commit itself to pay for copying time.

Employee Eva White was suspended in January 1977 and later discharged in June 1978 for poor attendance. After the initial suspension, two union representatives spent six hours handcopying White's attendance records, which consisted of several pages of comments and 27 typewritten attachments. They worked in a company office under the supervision of an operations manager who put his surveillance time to use in reading a newspaper. The company paid half-wages for the time spent copying but paid nothing for typing the 54 pages of handwritten copies. After grieving White's discharge in

June 1978, the union renewed its request for photocopies and once again was offered handcopying. By this time, the file had grown considerably, containing, by the company's reckoning, thirteen additional full pages of information. The union continued to press its demand for copies at higher level grievance meetings, but to no avail.

Employee William Benson was suspended in January 1979 for unauthorized presence in a company cafeteria. At first the company grievance representative refused to permit even handcopying but had operations manager Murphy read the eight relevant pages of Benson's file aloud while the union representatives took notes. Murphy later testified that his reading was "95 per cent verbatim". The company failed to respond to a written request for photocopies submitted by the union that explained in detail the union's need for exact copies and offered to reimburse the company's copying expenses. At a later meeting, the union questioned the accuracy of Murphy's original rendition. After some hesitation, the company agreed to another reading, which proved to be different than the first. Faced with the possibility of a "tie-breaker" third reading, the company finally relented and permitted union representatives, on their own time, to inspect the original documents and make handcopies. That process required another six hours of unpaid union time, including typing.

## II

We emphasize at the beginning of our analysis that we are concerned only with *means* by which the union could copy grievance-related materials supplied by the company. Specifically, we are not concerned with relevance. The General Counsel's complaint did not allege a failure to provide relevant information and the company, having provided for handcopying all of the information requested by the union, may not now argue that it had no duty at all to disclose the requested material. Nor is there any issue as to who should bear the

---

1. Although it is featured prominently in the company's brief, the grievance of a fifth employee, Glennon, formed no part of the decision of the ALJ or the Board.

cost of photocopying. The Board's order provides that the union shall bear the reasonable cost of furnishing photocopies and the union objects only to the Board's failure to set a figure for reasonable copying costs. Thus, the narrow question for review is whether the company could lawfully prohibit the union from obtaining, at its own expense, photocopies of documents provided to it pursuant to the company's statutory duty to furnish relevant information.

 During the terms of a collective bargaining agreement an employer must provide information requested by the union that is relevant and necessary to the union's prosecution of employee grievances under the agreement. Failure to do so violates §§ 8(a)(5) and (1) of the Act. *Western Massachusetts Electric Co. v. NLRB*, 589 F.2d 42, 46 (1st Cir. 1978); *Puerto Rico Telephone Co. v. NLRB*, 359 F.2d 983, 986 (1st Cir. 1966). In this case, the Board concluded that the company's ban on photocopying impeded the grievance process and therefore violated §§ 8(a)(5) and (1).

The ALJ's essential findings, adopted by the Board, were first, that the union required accurate and complete copies of relevant personnel records to represent properly grieving employees and second, that handcopying is substantially more prone to error, more expensive and more time-consuming than photocopying. The company does not seriously dispute the finding that it was necessary for the union to make accurate and complete copies in order to fulfill its function as grievance representative. The union must somehow transmit information it has acquired from the company from one stage of the grievance process to the next. Lacking originals, the obvious choice for the union is to send copies and preferably, as the company does, to send photocopies of the original documents. The company's labor relations manager and the union's president both testified to the importance of having an accurate statement of the facts in grievance cases. Union witnesses placed particular emphasis on their need to have an exact account of supervisors' file comments in order to check

them against other descriptions of the same events and supporting data for discrepancies.

There was testimony, if any were needed, that handcopying is a laborious process that tends to generate transcribing errors, especially when copying numbers or company codes unfamiliar to the copier. As to cost, the union was required to pay the handcopiers half-pay in one case and full pay in another for several hours of work, as well as to arrange for the handwritten notes to be typed. While these expenses alone certainly exceeded the cost of photocopying, the price of the "no photocopy" rule was still greater for the company, which had to pay a supervisor to observe the union copiers, and representatives for both the union and the company for excess grievance time devoted to reading personnel documents aloud and verifying handcopies. The ALJ found further evidence of the burdensomeness of handcopying in the fact that in no other context, outside of collective bargaining, does the company insist on doing business by way of handcopies.

We are satisfied that there is substantial evidence to support the Board's decision that the company rule impeded the grievance process in these four cases. The evidence establishes that the "no photocopy" rule made it expensive and time-consuming, if not impossible, for the union to obtain the reliable copies it required to discharge its duties as bargaining representative. The rule plainly disadvantaged the union in evaluating and prosecuting grievances and was likely to discourage resort to the grievance process at all in some cases.

In view of the company's vigorous defense of its ban on photocopies, we find it perplexing, to say the least, that it has neglected even to assert a legitimate business justification for its policy. Despite repeated inquiries by the ALJ, the company declined during the hearing to disclose the reason for its rule, and has continued on appeal to rely on its bare legal right to determine, as it chooses, how information will be disclosed to the union. As we said in *NLRB v. Borden, Inc., Borden Chemical*

*Division*, 600 F.2d 313, 318 (1st Cir. 1979), management's prerogative to determine the form of information disclosure is not a license to put the union "through the hoops": "The union is under no obligation to utilize a burdensome procedure of obtaining desired information where the employer may have such information available in a more convenient form" (*quoting The Kroger Company*, 226 N.L.R.B. 512, 513 (1976)). We held in *Borden* that management could not refuse to supply the union with insurance cost data because the same information could be had by polling the employees. We see no reason to accord greater deference to management prerogative, if any exists, when, as here, the employer supplies information in the requested form (original documents) but seeks to limit the means by which the union may make copies. We affirm the Board's decision that application of the "no photocopy" rule in these cases unnecessarily impeded the grievance process.[2]

### III

█ The company's second line of defense is that the union waived its statutory right to receive copies of relevant documents by raising and then abandoning the issue during contract negotiations. The company concedes that the union may relinquish a statutory right only by "clear and unmistakable" waiver. *See NLRB v. Perkins Machine Co.*, 326 F.2d 488, 489 (1st Cir. 1964); *Timken Roller Bearing Co. v. NLRB*, 325 F.2d 746, 751 (5th Cir. 1963), *cert. denied*, 376 U.S. 971, 84 S.Ct. 1135, 12 L.Ed.2d 85 (1964).

The issue of photocopies of grievance-related documents was discussed briefly on three different occasions spanning a three-month period during the 1977 contract negotiations. Number 28 of the union's 42 bargaining demands was for "exact copy of all pertinent local grievance information upon request." At the first bargaining session on June 8, 1977 the following discussion occurred:

"Company: We already have a big xerox bill.

Union: We'll be willing to give you three cents a copy.

Company: I'm afraid the cost goes much deeper than that. If you are serious about this demand then we might have to include a company demand to have copies of Union documents.

Union: Well, we're serious about this one."

A month later, on July 7, the negotiators returned to the subject of photocopies:

"Union: I'm sure [the Union] will pay for the cost of the paper. And it is ridiculous that we have a hassle over a sheet of paper when xerox machines are readily available. Hassle is the way we get the information. Let's clear it up.

Company: Tie this Demand to Company Demand # 1 [a new strike clause]. Otherwise we are not receptive to discussing it.

Union: I hear you, but we are not ready to tie anything together."

Finally, on August 13, the company declared its unwillingness to discuss the issue any further:

"Company: Let me respond to Union Demands 22, 22A, 17, 20, 23, 28, 31, 32, 34 and 36, not by just saying 'no', but by saying 'hell, no.' We plan no movement and I'm sure you are not surprised. With the objective of moving on, I thought I would group these together and address

---

**2.** In *Abercrombie & Fitch Co.*, 206 N.L.R.B. 464 (1973), relied upon heavily by the company, the Board summarily affirmed an ALJ's decision that a single failure to provide copies of some 3½ pages of uncomplicated records did not violate the Act. That case is readily distinguishable from this one by the amount and complexity of the requested data. Further, in that case no mention was made of a need for exact copies by the union nor does it appear that the union sought to make handcopies or offered to pay for photocopies. The union representative, rather, "believed that he had been given an adequate opportunity intelligently to consider and evaluate the requested information." The burden imposed on the grievance process by the company's rule in this case far exceeds the *de minimis* level present in *Abercrombie & Fitch*.

other items that need further discussion . . . ."

■ This sparse bargaining history, which is all that was said on the issue, comes closer to demonstrating a refusal to bargain by the company than it does a "clear and unmistakable" waiver by the union. Based on these few exchanges, the union would no doubt be surprised to learn that it had traded away its valuable statutory right in return for "no movement" on the part of the company. Where a statutory right is involved, the law of this circuit is that "a waiver should be express, and that a mere inference, no matter how strong, should be insufficient." *Perkins Machine Co., supra,* 326 F.2d at 489.

Nor is the requirement of an express waiver satisfied by the standard "zipper clause" included in the final agreement signed by the union and company. The clause provided:

"The Contract is in final settlement for its duration of all demands and proposals made by either party during negotiations and constitutes the entire understanding between the parties."

The contract, as far as we are informed, is silent on the question of waiver. This clause, which is intended to avoid the implication of contractual rights, is particularly ill-suited to an attempt to infer from the union's lack of success at the bargaining table an affirmative contractual waiver of a statutory right. The record establishes that the union proposal was rebuffed without serious discussion. We affirm the Board's conclusion that the union did not waive its right to obtain photocopies of grievance-related documents.

## IV

■ The company's final challenge is that the Board's order impermissibly sets down a per se rule requiring photocopies in all future cases without regard to the facts of particular grievances. Such a rule, the company urges, conflicts with the Supreme Court's statement in *Detroit Edison Co. v. NLRB,* 440 U.S. 301, 314–15, 99 S.Ct. 1123,

1130, 59 L.Ed.2d 333 (1979) that, "[t]he duty to supply information under § 8(a)(5) turns upon 'the circumstances of the particular case', *NLRB v. Truitt Mfg. Co.,* 351 U.S. 149 at 153, 76 S.Ct. 753, 756, 100 L.Ed. 1027, and much the same can be said for the type of disclosure that will satisfy that duty."

In *Detroit Edison* the union sought the test battery used by the company to evaluate applicants for promotion. The company resisted turning over the test questions directly to the union because of the risk that the secrecy of the test questions would be compromised and the test rendered useless. The company offered to disclose the test questions to an independent psychologist selected by the union who would guarantee the confidentiality of the questions. In this manner the union could obtain an expert evaluation of the validity of the test and the company would be protected against the expense of validating a new test battery.

As we have already observed, characterizing the "no photocopy" rule as going to the form or type of disclosure lends the rule undeserved dignity. Unlike the company's offer of indirect disclosure in *Detroit Edison,* the "no photocopy" rule does not determine the content of the information actually disclosed to the union, but relates simply to the physical "form" of copy which the union may create. Even in this superficial sense, the company's rule does not affect the form of *disclosure,* but rather limits the ability to take advantage of it. We may assume that with sufficient skill, patience and time a union copier could create a facsimile that, in form, exactly resembled the original supplied by the company.

More fundamentally, the company misapprehends the significance of the discussion of fact-sensitivity in *Detroit Edison.* The passage quoted only in part by the company continues:

"Throughout this proceeding, the reasonableness of the Company's concern has been essentially conceded. The finding by the Board that this concern did not outweigh the Union's interest in explor-

ing the fairness of the Company's criteria for promotion did not carry with it any suggestion that the concern itself was not legitimate and substantial [footnote omitted]." 440 U.S. at 315, 99 S.Ct. at 1131.

The fact-sensitivity of the duty to disclose thus derives from a balancing process in which the union's interest in disclosure is harmonized with the company's interest in maintaining confidentiality. In contrast to the legitimate and weighty rationale asserted by the employer in *Detroit Edison*, the company in this case has offered no reason to justify its ban on photocopies. Whether the actual reason is simply to make life difficult for the union, or some unknown justification, there is no basis on this record from which to argue that the strength of the company's rationale for not permitting photocopies is *variable* depending on the facts of each case. Common sense suggests that the burden of permitting photocopying will never exceed that of overseeing union scribes.

There is substantial evidence supporting the Board's conclusion that the union's need for photocopies would in every case outweigh the company's simple wish to deny them. In no reasonably foreseeable set of circumstances could it be said that handcopying is superior to photocopying in terms of efficiency and reliability of duplication. The continued restriction of relevance and the fact that the union must shoulder the cost of copying assures the company that it will not be forced to subsidize fishing expeditions. In sum, we cannot say that the Board exceeded its broad discretion to formulate remedies by concluding that in every situation that might arise between this company and union, a refusal to permit photocopying of information otherwise available to the union would unjustifiably impede the grievance process.

An alternative ground supporting the Board's remedy is what it described as the now nearly universal use of photocopies in business affairs by this employer and other companies. *See NLRB v. Weingarten, Inc.*, 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975) ("The responsibility to adapt the Act to changing patterns of industrial life is entrusted to the Board"). Where only the bare mechanics of collective bargaining are involved, it is reasonable to expect of the company a standard of conduct comparable to that which it brings to other important business affairs. *Cf. J. H. Rutter-Rex Mfg. Co., Inc.*, 86 N.L.R.B. 470, 506 (1949). We see nothing at odds with the policy of the Act in the Board's order directing the company to take affirmative action to remedy its double standard. Accordingly, we enforce the Board's order in its entirety.[3]

---

**3.** The union objects to the Board's modification of the ALJ's proposed order deleting a requirement that the company provide copies of witness statements in future cases and requiring the parties to bargain over the reasonable cost of copying to be assumed by the union, rather than imposing the figure of 10 cents per copy set by the ALJ. We believe that by raising these points in its reply to the company's exceptions, the union preserved its appeal rights, but find its objections are plainly without merit. The union's first argument—that by disclosing witness statements in one case the company has forever given up the right to withhold them—borders on the nonsensical. The second point—that the Board erred in refusing to set a reasonable figure for copying costs—cuts against the generally recognized principle that the terms of collective bargaining are to be left, to the greatest extent possible, to the bargaining parties. We see no basis for upsetting the Board's choice of remedies in this case. If the company refuses to bargain in good faith, that is a matter appropriately left to contempt proceedings.