## NATIONAL LABOR RELATIONS BOARD, Petitioner,

### v.

## DAVOL, INC., Respondent.

### No. 78–1450.

United States Court of Appeals, First Circuit.

Argued March 13, 1979.

Decided May 8, 1979.

Jerrold J. Wohlgemuth, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Andrew F. Tranovich, Atty., Washington, D. C., were on brief, for petitioner.

David F. Sweeney, Warwick, R. I., with whom Breslin, Sweeney & Lichatin, Warwick, R. I., was on brief, for respondent.

ON APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE NATIONAL LABOR RELATIONS BOARD

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.*

* Of the District of Rhode Island, sitting by designation.

PETTINE, District Judge.

This is an application for enforcement of an order of the National Labor Relations Board directing Davol, Inc., (Davol) to turn over certain information to Local 911, United Rubber, Cork, Linoleum and Plastic Workers of America, AFL–CIO (the Union).[1] The Board's decision affirmed the finding of the Administrative Law Judge (ALJ) that Davol's withholding of the information constituted an unfair labor practice, in that it amounted to a refusal to bargain collectively with the representatives of its employees in violation of § 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) and (5). Davol was ordered to turn over the disputed information on request, post compliance notices, and cease and desist from like or related practices.

The facts as found by the ALJ are unchallenged. At all times relevant to this case, Davol manufactured, sold, and distributed medical and surgical supplies from plants in Providence and Cranston, Rhode Island. The Providence plant has since closed. The Union is the collective bargaining representative of production and maintenance employees at both locations. The initial collective bargaining agreement between the parties was signed in September, 1970. Subsequent contracts were signed on January 27, 1974, and June 27, 1976. The controversy between the parties first began in December, 1971, when the Union filed grievance No. 31753, alleging that Davol's subcontracting of maintenance work to non-bargaining unit employees of the Boston Cleaning Co. at the then newly-opened Cranston plant violated Article X, Section 6(c) of the contract, which provided:

It is agreed that every effort shall be made to schedule maintenance work for the Maintenance Department of the plant if such department is equipped and employees are qualified by experience and skill to perform such work within the allotted time. However, it is agreed that the Company has the right to subcontract work whenever it cannot be done by its employees within the bargaining unit due to lack of equipment, skill, urgency of work and economic considerations.

The grievance went to arbitration, and ultimately, on April 5, 1976, the arbitrator determined it lacked merit. The arbitrator found that the Union did not meet its burden of showing that the subcontracting was not authorized by Article X, Section 6(c) of the contract because of the substantially uncontradicted evidence on equipment and economic savings presented by Davol.

In March, 1974, while the first grievance was still pending, the Union filed a second grievance, No. 1554, alleging violation of Article X, Section 6(c) of the 1974 collective bargaining agreement, a provision identical to that involved in the first grievance. This grievance was also based on the subcontracting of maintenance work at the Cranston plant. Davol denied this grievance as well, and a hearing before an arbitrator was scheduled for June 7, 1977. On May 31, in preparation for this hearing, Union President Roger Williams asked Davol's industrial relations manager Edward Kelley for cost comparison data covering the janitorial work at the Cranston plant. Later that day Kelley reported to Williams that Davol would not provide the information, adding that Davol's position was that the second grievance was resolved by the arbitrator's decision in the first grievance. Williams then postponed the arbitration proceeding on the grounds that the Union could not "evaluate the grievance". Subsequent efforts to obtain the requested information, on June 1 and September 30, 1977, met with a similar response.

Further factual developments require that we note the following chronology of events. In late 1975, at a discussion concerning negotiation of the 1976 contract, Davol informed the Union of the possibility that the Providence plant would be phased out. In February, 1976, Williams was informed that Davol was subcontracting some production work from the Providence and Cranston plants, which caused him to send a letter to Davol requesting information re-

1. *Davol, Inc.*, 237 N.L.R.B. No. 59 (1978).

garding the nature and amount of this subcontracting; Davol did not reply. The Union repeated its request during the subsequent negotiations for the 1976 contract. Davol then refused to provide any of the information, taking the position that it had an absolute right to subcontract production work. No change in this aspect of the contract was made in the final agreement. Subsequently, the Union noticed a reduction in the number of unit employees.

The Union suspected a connection between the reduction of employees and the subcontracting of production work. Therefore, it was concerned that laid-off employees might exhaust their recall rights under Article VII, Section 2(e) of the 1974 contract, which provided that continuous service and seniority terminates when an employee is absent due to layoff for a time equal to the employee's prior continuous service, up to five years. Additionally, the Union also suspected that the subcontracting might be part of the plan to phase out the Providence plant, and that some product lines were being discontinued. If the Providence plant was being phased out, the 1974 contract's severance pay provision, Article XII, might be applicable. This provision provided:

> In the event the Company closes its operations (Plant or Plants) or discontinues permanently a division or major portion of a Plant, each employee with one or more years of service whose employment shall be terminated by the Company as a direct result thereof shall be entitled to a severance pay allowance equal to one (1) percent of earnings, as defined below for each year of employment during an employee's period of continuous employment with the Company.

The Union also felt that discontinuance of product lines might be tantamount to discontinuing "a division or major portion of a Plant" within the meaning of this provision.

On April 7, 1977, Williams wrote a letter to Davol's Employee Relations Director, David Oskin, and once again requested information regarding subcontracting and elimination of products. On May 6, Mr. Oskin's response reiterated the company's position that it had a right to subcontract production work and that the information did not relate to anything in the collective bargaining agreement; therefore, he did not intend to provide it. Further efforts to obtain this information, on September 20 and October 26, 1977, were also to no avail.

Based on these facts and relying largely on *NLRB v. Acme Industrial Co.*, 385 U.S. 432, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967), the ALJ concluded that failure to provide the two types of requested information violated the duty to bargain imposed by Section 8(a)(5) of the Act. The ALJ noted that the duty to bargain includes the duty to confer with respect to questions arising under a collective bargaining agreement, as well as the duty to furnish relevant information necessary to enable the Union to discharge its function intelligently and effectively, citing *NLRB v. Acme Industrial Co.*, 385 U.S. at 436, 87 S.Ct. 565, 17 L.Ed.2d 495. He found that the cost comparison data was relevant to the pending grievance over the subcontracting of maintenance work; because economic considerations could be a justification for the subcontracting, the requested data was necessary for the Union to evaluate its grievance before the arbitration hearing.

Similarly, the ALJ found that data regarding subcontracting of production work and discontinuance of product lines was relevant to the issues of severance pay eligibility and exhaustion of reinstatement rights of employees laid off because of what the Union suspected was part of the phasing out of the Providence plant. Slip op. at 10. Therefore, he concluded both types of information were relevant to policing the contract and hence necessary for the Union to discharge its duties effectively.

The Board affirmed the ALJ's decision, rejecting Davol's contention that it should defer to the arbitrator's award in the first grievance with respect to the failure to provide cost comparison data regarding the maintenance subcontracting. The Board found that the arbitrator had not ruled on the propriety of the refusal to furnish the

data, noting especially that the request was made subsequent to the arbitrator's decision. 237 NLRB No. 59, slip op. at n.2.

Davol primarily argues in this appeal that the Board should have deferred to the arbitration machinery established in the collective bargaining agreement, under the deferral doctrine set forth in *Collyer Insulated Wire,* 192 N.L.R.B. 837 (1971), and further argues that there is no evidence that the requested information was relevant to the bargaining relationship between the parties. We will examine these arguments as they apply to each of the sets of information requested.

*A. Cost Information of Maintenance Subcontracting*

Davol argues that because its position is that the decision of the arbitrator in grievance No. 31753 was *res judicata* as to grievance No. 1554, it is entitled to have the arbitrator determine the threshold question of the arbitrability of No. 1554 before it need furnish any information which might pertain to the substantive aspect of that grievance. Hence, it argues, the Board should have deferred to the arbitrator under the *Collyer* doctrine. Furthermore, Davol notes that under *NLRB v. Acme Industrial Co., supra,* the Board may only require that information be furnished when it can do so without making a binding construction of the contract. It then argues that by ordering disclosure of cost comparison data in the present case, the Board has made an affirmative decision that the second grievance is arbitrable, a decision that can only be reached by interpreting the contract, in violation of the principle announced in *Acme.*

■ The *Collyer* doctrine states that the Board will defer to the arbitration process where the contract clearly provides for grievance and arbitration machinery, where the action which is the subject of complaint is not patently incorrect but is based on a substantial claim of contractual privilege, and where it appears that arbitration will resolve both the unfair labor practice and the contract interpretation issues. How-

ever, deferral is not automatic under *Collyer.* The Board retains the right to prevent unfair labor practices regardless of any other means of adjustment established by agreement. *See* section 10(a) of the Act, 29 U.S.C. § 160(a); *NRLB v. Acme Industrial Co., supra,* 385 U.S. at 437, 87 S.Ct. 565. More importantly, where the issue is one of statutory construction and not of contractual interpretation, there is no need for deferral. *Stephenson v. NLRB,* 550 F.2d 535, 537 (9th Cir. 1977).

■ In the present case, the issue is not whether Davol can properly subcontract maintenance work or whether the decision in the prior grievance bars prosecution of the second grievance; it is whether Davol can be required to furnish information relevant to the second grievance prior to a decision by the arbitrator. Neither party has pointed to anything in the contract dealing with the obligation to furnish information or providing for arbitration over requests for information. Consequently, it appears that the question of Davol's duty to furnish information is one of statutory, not contractual interpretation. Therefore, deferral is not indicated under the Board's policies.

Davol's position, however, is that in ordering it to furnish the information, the Board has of necessity determined that the second grievance is not barred by the decision in the first, thereby improperly invading the arbitrator's preserve and violating the definition of the scope of the employer's duty to disclose set forth in *NLRB v. Acme Industrial Co., supra.* In *Acme,* the United States Supreme Court held that the Board need not await an arbitrator's determination that requested information is relevant before it can enforce the union's statutory rights under section 8(a)(5). The Supreme Court felt this was proper, in part because it concluded that in ordering the information to be produced, the Board did not make a binding construction of the contract, but rather enforced a discovery-type standard that the requested information was relevant and would be useful to the union in carrying out its statutory duties. 385 U.S.

at 436–37, 87 S.Ct. 565. The Supreme Court found that rather than usurping the arbitrator's preserve, the Board had helped the arbitral process, by giving the union access to information which would help it evaluate the merits of its claim without going all the way through arbitration. *Id.* at 438, 87 S.Ct. 565.

Despite Davol's claim to the contrary, we conclude that the Board did not invade the arbitrator's preserve and that it fully followed the guidelines of *Acme.* Notwithstanding the order to disclose the requested information prior to the arbitration hearing, the arbitrator may still find that the second grievance is barred by the decision on the first grievance. However, it is not clear that this is the only possible result. An arbitrator might interpret the contract term in question, which allows subcontracting of maintenance work for economic reasons, as allowing such subcontracting only as long as the economic justification remains. If the Union presented evidence that a prior economic justification (such as the one found to exist by the arbitrator in the first grievance) no longer exists, then an arbitrator might find that, due to such changed circumstances, the first decision was not *res judicata* as to the second grievance. Such evidence can only be obtained if the employer furnishes the requested information.

We do not hold, nor did the Board hold, that this interpretation must be made. As we noted in *Western Massachusetts Electric Co. v. NLRB,* 589 F.2d 42 (1st Cir. 1978) (*WMECO II*), it is not the function of the Board or this Court to interpret the contract finally, although either may examine the contract to determine as a threshold matter whether there is a probability that information requested may be relevant to a possible grievance. *Id.* at 48 n.8. *Accord, Acme, supra,* 385 U.S. at 437, 87 S.Ct. 565. We do conclude that there is such a probability. It is clear that the Union cannot argue the merits of this interpretation without the economic data which it seeks to obtain. The information is relevant to both the substance of the grievance and to the question of its arbitrability. Indeed, it may very well be that disclosure would cause the Union to drop its grievance entirely as without merit, in which case the goal of protecting the arbitration system from being overburdened would be furthered. *See Acme, supra,* 385 U.S. at 438, 87 S.Ct. 565. Ordering disclosure simply does not determine the arbitrability of the grievance; it merely follows from a conclusion that the information is likely to be relevant to the issues raised by the grievance.[2] The Board's order lies precisely within the guidelines of *Acme* : it enforces a discovery-type standard that the requested information is relevant and can help the Union evaluate the merits of its claim prior to arbitration, without making a binding construction of the contract or usurping the role of the arbitrator. Therefore, we conclude that the Board properly declined to defer to arbitration and properly ordered disclosure of the requested information under the principles of *Acme* and *WMECO II.*[3]

Davol also argues that this Court's decision in *Western Massachusetts Electric Co.*

---

**2.** Davol's attempt to rely on *United Aircraft Corp.,* 204 N.L.R.B. 879 (1972), enf'd, 525 F.2d 237 (2d Cir. 1975), is misplaced. In *United Aircraft,* because the contract had language regarding the employer's obligation to furnish information, the Board held it should defer to arbitration the question of whether the employer should furnish the requested information. Here, however, there is no contract language on this issue, hence no reason to defer. The issue is not interpretation of contract language, but whether information relevant to preparing for a grievance should be disclosed.

**3.** Davol's attempt to rely on *Sinclair Refining Co. v. NLRB,* 306 F.2d 569 (5th Cir. 1962), and, *Hercules Motor Corp.,* 136 N.L.R.B. 1648 (1962), in support of its position that an employer need not furnish information relating to a grievance when it contests the arbitrability of a grievance, is without merit. The decision in *Sinclair* was expressly disapproved by the United States Supreme Court in *Acme Industrial Co. v. NLRB,* 385 U.S. 432, 437, 87 S.Ct. 565, 17 L.Ed.2d 495 (1967). Similarly, the position taken by the Board in *Hercules Motor Corp.* cannot have survived the decision in *Acme. See P. R. Mallory & Co. v. NLRB,* 411 F.2d 948, 956 (7th Cir. 1969).

*v. NLRB,* 573 F.2d 101 (1st Cir. 1978) (*WMECO I*) (involving a separate proceeding from *WMECO II*), precludes disclosure of subcontracting cost information. Such a reading of our case is too broad. In *WMECO I*, we held that information regarding subcontracting costs need be disclosed only when such costs are put into contention. Hence we held that the Board properly ordered WMECO to disclose subcontracting cost information once the company claimed it was economically necessary to remove contractual restriction on subcontracting. Yet in the companion case of *Connecticut Light & Power Co. v. NLRB,* 573 F.2d 101 (1st Cir. 1978), we held that the Board's disclosure order was improper because the company had not claimed economic necessity; instead, the union was trying to capture work properly subcontracted under the prior collective bargaining agreement. Davol seeks to compare the present case to *Connecticut Light & Power* by alleging that the Union was seeking to capture work which it had never performed by bringing a grievance regarding the subcontracting of maintenance work.

■ We conclude, however, that the present case is more akin to *WMECO I* than to *Connecticut Light & Power.* While it may be true that the Union is seeking to capture work which it has never performed, the contract itself makes economics an issue whenever there is subcontracting of maintenance work. Therefore, such information is relevant to contract enforcement and the Union is entitled to obtain it in order to evaluate Davol's claim, just as the union in *WMECO I* was entitled to obtain economic information to evaluate WMECO's claim.

*B. Information Regarding Subcontracting of Production Work and Discontinuance of Product Lines*

■ With regard to information regarding subcontracting of production work and

discontinuance of product lines, Davol again argues that it need not provide any such information unless and until the grievance procedure is utilized to determine that the collective bargaining agreement restricts its right to subcontract production work, or that discontinuance of a product line is the same as discontinuing a division or major portion of the plant within the meaning of Article XII of the contract.

This argument is easily rejected. While there may be a significant question as to whether there is any restriction in the contract on the company's right to subcontract production work, it is clear that by subcontracting or by discontinuing product lines the company may activate the applicability of other clauses. For example, if employees were laid off due to temporary subcontracting, the provisions of Article VII, Section 2(e) for recall of laid off employees would apply when the subcontracting ended. If the subcontracting or discontinuance of product lines was part of the plan to close the Providence plant, or if enough product lines were discontinued to constitute closure of a division or major portion of the plant, then the provision of Article XII for severance pay might be implicated. Consequently, information regarding production subcontracting and discontinuance of product lines was highly relevant to the Union's interest in insuring the contract was being fulfilled, without reference to the issue of whether or not Davol could subcontract such work or discontinue product lines. *WMECO II, supra,* 589 F.2d at 48. While the ultimate issue of whether severance pay was appropriate, or whether the recall provisions were properly followed, may be best determined by an arbitrator, the Union is entitled to the requested information in order to determine whether it should bring appropriate grievance procedures to enforce the contractual provisions. *See Torrington Co. v. NLRB,* 545 F.2d 840 (2d Cir. 1976).[4]

4. Contrary to Davol's assertions, we do not read the ALJ's decision as definitively interpreting the contract to require severance pay due to production subcontracting or discontinuance of product lines. The ALJ specifically noted that the data requested "pertained" to

the contractual provision regarding severance pay and was therefore "relevant to the policing of the contract". Slip op. at 10. The arbitrator remains free to determine, based on the information presented by the Union and Davol, whether or not the production subcontracting

Davol also argues that *WMECO I* precludes an order that it disclose information on subcontracting of production work. As was true with regard to cost information on maintenance subcontracting, this argument must fail. By granting recall and severance pay rights, Davol put in issue whether subcontracting implicates those rights when it appears that there may be a relationship between the subcontracting and a diminution of the work force. Furthermore, there was an apparent diminution in work force immediately following the commencement of product subcontracting. This Court specifically noted in *WMECO I* that such product subcontracting could well be a mandatory subject of bargaining if there is a connection between the subcontracting and the loss of work. In such a situation information regarding product subcontracting would be presumptively relevant to the Union's bargaining function and disclosure properly could be required. *WMECO I, supra,* 573 F.2d at 106. Therefore, even assuming that the present contract granted an unlimited right to subcontract production work, the issue could be a mandatory subject of bargaining at the next contract negotiations if jobs were lost as a result, and the Union could properly seek information regarding it in preparation for the negotiations.

*Conclusion*

We conclude that this case is indistinguishable from *NLRB v. Acme Industrial Co., supra,* 385 U.S. at 432, 87 S.Ct. 565. The Board properly refused to defer to arbitration and properly ordered Davol to disclose the information requested by the Union.[5] In so ordering, the Board did not determine the meaning of the contract; it acted only upon the probability that the desired information is relevant. The Board's "threshold determination concerning the potential relevance of the requested information . . . [f]ar from intruding upon the reserve of the arbitrator . . . was in aid of the arbitral process". *Id.* By requiring disclosure, the Board makes it possible for the Union to evaluate its grievance, or potential grievance, before it incurs the expense of arbitration, rather than discover at arbitration that its grievance was unfounded. *Id.* We therefore enforce the Board's order.[6]

*Enforcement granted.*

---

or the discontinuance of product lines invokes the severance pay clause. The same is true with respect to the provisions governing reinstatement rights.

5. Because we find that the Board has not departed from its policy of deferring to arbitration procedures where appropriate, we do not reach Davol's contentions that the Board changed its policy in violation of the Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.*

6. Davol argues that the Board's compliance order is too broad, in that it cannot determine exactly what information it must disclose. We find, however, that the order is sufficiently clear in light of this litigation. To the extent that Davol may have some question as to exactly what it is the Union seeks, we are confident that a mutually acceptable result can be reached by the parties.