**INDIANA & MICHIGAN ELECTRIC COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 78–2060.**

United States Court of Appeals, Seventh Circuit.

Argued Feb. 16, 1979.

Decided May 29, 1979.

---

E. Allan Kovar and Patricia C. Slovak, Chicago, Ill., for petitioner.

Marjorie S. Gofreed, N.L.R.B., Washington, D. C., for respondent.

Before CUMMINGS and TONE, Circuit Judges, and LEIGHTON, District Judge.*

TONE, Circuit Judge.

The issue in this case is whether disciplining union stewards and a union officer more severely than rank-and-file employees for participation in an unlawful strike was inherently destructive of important employee rights and hence a violation of §§ 8(a)(3) and (1) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(3) and (1), regardless of business justification and absence of anti-union motivation. The National Labor Relations Board held that it was. We disagree and therefore deny enforcement of the Board's order.

The facts are not in dispute. The employer is a public utility supplying electricity in the area of Fort Wayne, Indiana. On April 26, 1977, approximately 50 of the employees in its line department, all of whom were members of the bargaining unit represented by Local Union No. 1392, International Brotherhood of Electrical Workers, stopped work and walked off the premises. This action violated Article III, § 1 of the collective bargaining agreement, which provides in relevant part as follows:

It is expressly understood and agreed that the services to be performed by the employees covered by this Agreement pertain to and are essential to the operation of a public utility and to the welfare of a public dependent thereon, and in consideration thereof and of the covenants and conditions herein by the Company to be kept and performed (a) the International Brotherhood of Electrical Workers and the Local Union agree that the employees covered by this Agreement, or any of them will not be called upon or permitted to cease or abstain from the continuous performance of the duties pertaining to the positions held by them with the Company in accord with the terms of this agreement . . . .

Four union stewards and one union officer, whom we shall sometimes call union officials, informed their supervisors that they were ill and left with the other strik-

* The Honorable George N. Leighton, District Judge of the United States District Court for the Northern District of Illinois, is sitting by designation.

ers. They were not in fact ill. None of the five helped to organize or to lead the walkout.[1] That afternoon three of the stewards joined in an effort to end the strike. The other steward and the union officer did not. All of the strikers returned to work the next morning.

Based upon the five union officials' own representations as to their actions during the strike, the company took the following disciplinary action: The three stewards who belatedly aided the effort to end the strike each received a one-day suspension. The steward and the officer who did not each received a three-day suspension. The discipline administered to rank-and-file participants consisted only of a written warning.

The union filed charges alleging that the disciplinary action against the five union officials constituted a violation of § 8(a)(3) and § 8(a)(1), and the Board issued a complaint. The Administrative Law Judge held that the company's action discriminated against five union officials solely on the basis of their positions with the union and thus violated §§ 8(a)(3) and (1). The Board affirmed without opinion and issued an order accordingly. 237 N.L.R.B. No. 35 (1978).

As in *NLRB v. Great Dane Trailers, Inc.,* 388 U.S. 26, 32, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (1967), the unfair labor practice before us "is grounded primarily in § 8(a)(3)."[2] In that case the Supreme Court set forth the following principles:

> First, if it can reasonably be concluded that the employer's discriminatory conduct was "inherently destructive" of im-

portant employee rights, no proof of an antiunion motivation is needed and the Board can find an unfair labor practice even if the employer introduces evidence that the conduct was motivated by business considerations. Second, if the adverse effect of the discriminatory conduct on employee rights is "comparatively slight," an antiunion motivation must be proved to sustain the charge if the employer has come forward with evidence of legitimate and substantial business justifications for the conduct. Thus, in either situation, once it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to some extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

388 U.S. at 34, 87 S.Ct. at 1798. *See also Radio Officers' Union v. NLRB,* 347 U.S. 17, 42–48, 74 S.Ct. 323, 98 L.Ed. 455 (1954); *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 380, 88 S.Ct. 543, 19 L.Ed.2d 614 (1967); R. Gorman, *Basic Text on Labor Law* 335 (1976). We shall assume that disciplining union stewards or officers more severely than rank-and-file members for participating in an illegal strike constitutes discriminatory conduct and is therefore subject to the *Great Dane* test.[3]

The Board relies solely on the alleged "inherently destructive" nature of the employer's action. The legitimacy and substantiality of the business justifications advanced by the employer are not contested,[4]

---

**1.** Two other union officers remained at work and made efforts to end the strike. One other steward in the line department service section arrived at work after the strike began but remained at work the entire day, as did all service employees. Two stewards did not report to work that day for health reasons that are not questioned. None of these employees were disciplined.

**2.** A violation of § 8(a)(3) constitutes a derivative violation of § 8(a)(1) when, as is alleged here, the employer's acts served to discourage union membership or activities. The opinion of the ALJ does not reflect a determination that there was an independent violation of § 8(a)(1)

and the Board does not contend that we should treat the two provisions separately. The same proof is therefore required to establish a violation of either section. *Inter-Collegiate Press, Graphic Arts Division v. NLRB,* 486 F.2d 837, 844 (8th Cir. 1973).

**3.** Arguably, if a union official's participation in an illegal strike is more serious misconduct than that of a rank-and-file member in view of the former's greater responsibility, the more severe sanctions are not discriminatory.

**4.** The importance of assuring uninterrupted electrical service to the community, acknowledged in the collective bargaining agreement's

nor is the absence of evidence of antiunion motivation.[5]  Accordingly, the narrow issue before us is whether the employer's conduct was "'inherently destructive' of important employee rights."  *NLRB v. Great Dane Trailers, Inc., supra,* 388 U.S. at 32, 87 S.Ct. at 1798.

Employees have no right to participate in an illegal strike.  Accordingly, if any employee right is threatened here, it must be one relating to union office.  The Board has said and we recognize that union office "embodies the essence of protected concerted activities."  *See General Motors Corp.,* 218 N.L.R.B. 472, 477 (1975), *enforced,* 535 F.2d 1246 (3d Cir. 1976).  Employer action that would impair some right or restrict some legitimate activity of union officials and thereby discourage members from holding union office would no doubt have an inherently adverse effect on employee rights.  The same is not true, however, of employer action that at most deters union officials from deliberately engaging in clearly unlawful conduct that is both a violation of their duties as employees and union members and a repudiation of their responsibilities as union officials.

In arguing that status as a union official may not be the sole criterion for differentiating among employees in meting out discipline, the Board somewhat misstates the issue.  The more severe punishment was not based merely on the officials' status but upon their breach of the higher responsibility that accompanies that status, a breach that makes their misconduct more serious than that of the rank-and-file.

Until recently the Board has recognized that the higher responsibilities of union officials justify disciplining them more severely than rank-and-file members for participating in unprotected activity.  A divided Board shifted to the contrary view in *Precision Casting Co.,* 233 N.L.R.B. No. 35 (1977), and *Gould Corp.,* 237 N.L.R.B. No. 124 (1978).[6]  Two of the five members of the Board believe that these cases represent a departure from prior law,[7] and we do also.

To begin with, an employer having a reasonable basis for making such a distinction may discipline fewer than all unlawful strikers.  *J. P. Weatherby Construction Corp.,* 182 N.L.R.B. 690, 697 & n. 31 (1970).  *Cf. N.L.R.B. v. Fansteel Metallurgical Corp.,* 306 U.S. 240, 259, 59 S.Ct. 490, 83 L.Ed. 627 (1939).  The higher responsibilities of union officials have been considered to be such a justification in cases prior to *Precision Casting.*

In *Chrysler Corp., Dodge Truck Plant,* 232 N.L.R.B. No. 74 (1977), the Board upheld the discharge of a chief steward who was said to have "exercised a leadership role" in an unlawful walkout, *id.,* slip op. at

no-strike clause, cannot be disputed.  The absence of any damage remedy against the strikers for breach of the no-strike clause of the contract, *Sinclair Oil Corp. v. Oil, Chemical and Atomic Workers Union,* 452 F.2d 49, 54 (7th Cir. 1971), makes the possibility of disciplinary action the only effective deterrent to violation of that clause.

5.  The employer's attempt to prove the absence of antiunion motivation was cut short by the ALJ on the ground that the Board's General Counsel did not contend that there was an antiunion motivation for the employer's action.

6.  *Gould* followed *Precision Casting.*  The only authority cited by the Board in *Precision Casting* for the proposition that selectively disciplining union officials for acts performed by officials and members of the rank-and-file violates § 8(a)(3) is *Pontiac Motors Division, General Motors Corp.,* 132 N.L.R.B. 413 (1961).  233 N.L.R.B. No. 35, slip op. at 4 & n. 4.  In

*Pontiac Motors Division,* however, the disciplined union committeeman "neither caused nor took part in the work stoppage," *id.* at 415, and made efforts to avoid it, in compliance with his contractual obligations.  Thus, the *Pontiac Motors Division* employer actually did discipline the committeeman *solely* because of his status as a union official and not because of his acts or omissions.  *Precision Casting, Gould,* and the case at bar involve some measure of active participation in the unlawful activity by the disciplined officials; the Board cites no case antedating *Precision Casting* which holds that the imposition of more severe discipline on participant officials violates § 8(a)(3).

7.  *See Gould Corp., supra,* 237 N.L.R.B. No. 124, slip. op. at 4–7 and 8–18 (Truesdale, Member, concurring in part and dissenting in part, and Penello, Member, dissenting).

21.[8] It is on the "leadership role" that the Board seizes in an attempt to distinguish *Chrysler,* but this attempt will not survive an analysis of that decision. The Board's conclusion that the chief steward played a leadership role is based largely on incidents of his union office in conjunction with his "presence" among those who walked out.[9] The statement of facts shows that he did not participate in the instigation or organization of the walkout, which was done by other persons, either members of the rank-and-file or line stewards, lower-ranking officials not formally recognized by the employer. Yet the chief steward, who was the highest ranking union official in his department and the only official in that department recognized by the employer, received the most severe punishment. Thus, the Board upheld punishment of a union official more severe than that imposed on others equally or more culpable who were not union officials. *Cf. Super Valu Xenia,* 228 N.L.R.B. 1254, 1259 (1977).

In *Russell Packing Co.,* 133 N.L.R.B. 194 (1961), the Board upheld the discharge of a steward who had merely participated, with rank-and-file employees not punished by the employer, in the unlawful work stoppage. In other cases, although the disciplined officials were more involved than the rank-and-file employees, the Board has recognized that their status as officials was a proper·factor on which to base more severe disciplinary action. *University Overland Express, Inc.,* 129 N.L.R.B. 82, (1960); *Stockham Pipe Fittings Co.,* 84 N.L.R.B. 629 (1949). As the Board said in these cases, union officials are subject to "an even greater duty than the rank-and-file employees to uphold [the contract] provisions." 84 N.L.R.B. at 629; 129 N.L.R.B. at 92. *See Riviera Mfg. Co.,* 167 N.L.R.B. 772, 775 (1967). The recent Board decisions now relied upon in defense of the order under review seem to us to represent a departure from that principle, and to be erroneous.[10]

**8.** For reasons unknown to us, the Board in *Chrysler Corp., Dodge Truck Plant* appears to evaluate the discharge of the chief steward solely on the basis of § 8(a)(1). As we explained in note 2, *supra,* this makes no difference to our analysis.

**9.** The ALJ stated in his opinion, which was affirmed by the Board:

Smith was elected to his position as shop steward by the second shift employees in his department on two occasions. He did not cease to be a leader of these people in matters involving labor relations merely by leaving the plant gates. Others, including Respondent's officials, had every right and reason to regard Smith as the leader of any gathering of Department 9110 employees regardless of where it took place especially if no other Union officials were in the area. Smith regularly spoke for such employees in the plant during short walkouts which had occurred from time to time and had adjusted these problems when they arose. One of Smith's admitted reasons for coming to the Keweenah [a bar at which employees met during a strike] instead of going home was that grievances were going to be discussed. It was Smith who was contractually responsible for processing grievances for Department 9110 employees at the first step and who was looked to by the employees for this purpose. Not long before the May 31 walkout, it was Smith who informed Manty in the course of a private conversation that Department 9110 employees were getting angry

over the failure of the Respondent to adjust grievances and that they were going to take drastic action and were willing to incur possible disciplinary action to resolve these matters. Accordingly, in light of considerations relating to his actions on the afternoon and evening in question, I conclude that Smith not only was engaged in an illegal walkout but that his presence provided this action with his active approval and encouragement, not merely negative leadership, and that the Respondent had ample basis for concluding ·that Smith exercised a leadership role in this walkout when it determined to discharge him on May 31.
232 N.L.R.B. No. 74, slip op. at 21.

**10.** The Board has also recognized that the special responsibilities of union officials justify the employer in treating them more favorably than the rank-and-file when doing so facilitates the discharge of those responsibilities. *E. g., Paintsmiths, Inc.,* 239 N.L.R.B. No. 192 (1979) and *Scott & Duncan,* 239 N.L.R.B. No. 191 (1979) (hiring preference, with resultant layoff of rank-and-file member); *Chrysler Corp.,* 228 N.L.R.B. 1446 (1977) (superseniority for overtime shift selection); *Union Carbide Corp.,* 228 N.L.R.B. 1152 (1977) (superseniority for protection against shift transfer); *Limpco Manufacturing Co.,* 230 N.L.R.B. 406 (1977), *pet. denied sub nom. D'Amico· v. NLRB,* 582 F.2d 820 (3d Cir. 1978) (superseniority for protection against layoff). *See Dairylea Cooperative, Inc.,* 219 N.L.R.B. 656 (1975), *enforced sub nom. NLRB*

Differentiating between union officers and rank-and-file in meting out discipline for participating in a clearly illegal strike [11] did not penalize or deter the exercise of any protected employee right. We believe the employer was entitled to take into account the union officials' greater responsibility and hence greater fault, and that the resulting different treatment of union officials could not be reasonably considered inherently destructive of important employee rights.

ENFORCEMENT DENIED.

v. Milk Drivers & Dairy Employees, Local 338, 531 F.2d 1162 (2d Cir. 1976). Union officials may engage in activities or behavior while performing their duties for which employers could punish rank-and-file members. E. g., Crown Central Petroleum Corp., 177 N.L.R.B. 322 (1969); Thor Power Tool Co., 148 N.L.R.B. 1379 (1964), enforced, 351 F.2d 584 (7th Cir. 1965) (engaging in formal and informal meetings concerning grievances during working hours, and directing obscene and deprecatory remarks at management representatives).

11. We are not considering a situation in which the disciplined officials believed that the walkout in which they participated was lawful for any reason.