**HAMMERMILL PAPER COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

No. 80–2499.

United States Court of Appeals,
Third Circuit.

Argued May 21, 1981.

Decided Aug. 26, 1981.

Opinion on Denial of Rehearing
Nov. 2, 1981.
See 665 F.2d 56.

Scott F. Zimmerman (argued), Stephen J. Stabler, Reed Smith Shaw & McClay, Pittsburgh, Pa., for petitioner.

Robert Sewell (argued), Michael R. White, Attys., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.

Before ADAMS, ROSENN and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

ROSENN, Circuit Judge.

This case presents the question whether the National Labor Relations Board should have deferred to, or concurred in, an arbitrator's decision permitting the disciplinary suspension of Thomas Stritzinger, a union steward. Hammermill Paper Company (Hammermill) admittedly enhanced Stritzinger's punishment for his failure, as a union steward, to take affirmative steps to defuse an illegal work stoppage. Although upholding, in part, the enhancement of his punishment, the arbitrator found that Stritzinger had no contractual duty under the circumstances to take such affirmative steps. On September 30, 1980, the Board ordered Hammermill to make Stritzinger whole for the loss of pay he suffered by reason of discrimination in violation of section 8(a)(1) & (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (3) (1976). 252 N.L.R.B. 1236 (1980). Hammermill petitioned this court for review, and the Board cross-applied for enforcement under 29 U.S.C. § 160(e) & (f). We enforce the order of the Board and deny the petition for review.

I.

On the bitterly cold night of February 18, 1979, near Erie, Pennsylvania, nine employees of Hammermill, including Stritzinger, were called upon by their supervisors to build and tend a fire under a frozen "jackladder." They refused. Two of the nine, John Hughes and Paul Gallagher, having no record of prior disciplinary problems at the company, were suspended for two weeks without pay. Six of the nine, each having once previously been reprimanded for an unrelated, unexplained absence from work, were discharged. The ninth man, Stritzinger, despite a "clean" personnel record, was discharged on the ground that he had failed "to take affirmative action as a Union Representative in the face of a concerted action" in violation of the collective bargaining agreement.[1]

The nine employees, believing their refusal to build or tend the fire was justified on grounds of either safety or job jurisdiction, and also believing that Hammermill had improperly enhanced the punishments of the seven fired employees, grieved the discipline to arbitration.

---

1. By letter Hammermill notified Stritzinger that:

    As a result of your refusal to perform the work assignment given to you by your Foreman and the General Foreman on February 18, 1979, specifically, to prepare materials for a fire at the Woodroom Jackladder, and, additionally, your failure to take affirmative action as a Union Representative in the face of a concerted action in the violation of Article IV, para. (a), your employment with Hammermill Paper Company is terminated.

The arbitrator held that the employees had acted improperly in refusing to build and maintain the fire. The arbitrator believed "that the evidence justifies the finding that the men acted in an egregiously improper manner" and that they deserved disciplinary action but not discharge. Although he concluded that the seven dischargees should be returned to work, he also held that they did not deserve any backpay.

In this case, I feel that to award backpay to these employees would be interpreted as a reward for their activity on the night in question. It was not conduct which ought to be rewarded. It was conduct that ought to be condemned in the most stringent of terms. Their return to work is based, in part, on the procedural defects in the method used to discharge them, and in part on the fact that the disparity meted out to the employees involved is just too great and not justified by their prior records. Accordingly, in light of all the testimony and evidence, the conclusion will be that the seven employees should be returned to work without backpay. The arbitrator will not disturb the two weeks suspension given to the two employees.

The effect of this award was to reduce the penalties of the seven fired employees to a suspension of approximately five months.

Although it might have been argued that Hammermill's impulse to enhance the punishment of the "recidivists" was, to some degree, justifiable,[2] the arbitrator's award revealed that there was no such justification in Stritzinger's case, outside of a belief that the two-week suspension was an overly lenient punishment for *any* of the men. The arbitrator found that "[t]here was no reason to single Stritzinger out for differential disciplinary action on the grounds of his stewardship." This finding followed from the arbitrator's interpretation of the labor contract. Under it, he found that although Stritzinger was among those employed on the night of the incident, "[a] steward's jurisdiction is confined to a particular shift, seniority group, and department. [But o]n the evening in question, Stritzinger was not the steward. He was not so regarded."

Thus, the arbitrator apparently concluded that while the employer had no cause for treating Stritzinger more harshly than the other eight men, he believed that a 5-month suspension without backpay was not an inappropriate penalty for any of the men. For this reason, the arbitrator held that the employer did not have just cause to fire Stritzinger and he directed reinstatement, but *without* backpay. The NLRB's General Counsel apparently disagreed with the denial of backpay and subsequently issued a complaint charging that Stritzinger's discipline had constituted a violation of § 8(a)(3), and requesting the Board to order backpay.

Before the Board, Hammermill attempted to prove that Stritzinger's punishment was justified not on the grounds originally asserted by Hammermill (*viz.*, Stritzinger's failure as steward to affirmatively halt the unauthorized refusal), but on the alternate ground that Stritzinger had instigated or led the refusal.[3] However, the ALJ, like

---

2. The arbitrator did not find the prior reprimands an insufficient ground for enhancing the punishment by adding an extra 4½ months of suspension. Thus, the arbitrator's award might arguably have been read as finding that the added suspension period *was* justified by the prior reprimands.

3. Even under the Board's view of § 8(a)(3), and clearly under the Third Circuit's view, such instigation would have been grounds for differential punishment of a union steward. *E. g., Midwest Precision Castings Co.*, 244 N.L.R.B. 597 (1979). However, Board precedents indicated that absent instigation by Strizinger, Hammermill's stated reason for discharge would not have passed muster under § 8(a)(3). *E. g., Precision Castings Co.*, 233 N.L.R.B. 183 (1977). *See also Westinghouse Elec. Corp.*, 243 N.L.R.B. 306, 312 n.32 (1979), *enforced mem. sub nom. International Union of Elec., Radio & Mach. Workers v. NLRB*, No. 79–1707 (D.C. Cir. Dec. 5, 1980), *cert. denied,* —— U.S. ——, 101 S.Ct. 3122, 69 L.Ed.2d 980 (1981). Courts of appeals, on the other hand, have taken a view more favorable to employers. As of the date the Board's order was entered, the rule of *Precision Castings* had been rejected by the Third and Seventh Circuits. *Gould, Inc. v. NLRB*, 612 F.2d 728 (3d Cir. 1979), *cert. denied,* ——— U.S. ——, 101 S.Ct. 247, 66 L.Ed.2d

the arbitrator, rejected Hammermill's evidence.[4] The ALJ declined to defer to the arbitral award itself, however. He held that because the disparity between the sanctions imposed on Stritzinger and the two other men with "clean" records stemmed from Stritzinger's stewardship, Stritzinger's discharge violated § 8(a)(3). Thus, he found that the arbitrator's failure to award Stritzinger back pay was contrary to Board policy.

A panel of the Board, by a 2–1 vote, adopted the ALJ's rulings, findings and conclusions. According to the Board, the arbitrator had "disregarded" the evidence and the Act and had "found that [Hammermill's] treatment of Stritzinger was *unrelated* to his union affiliation. . . ." (Emphasis added.) Therefore the Board found that the arbitrator had "rejected . . . material evidence which was admitted, unchallenged, and formed a primary basis for Stritzinger's discharge and the unfair labor practices alleged." Moreover, even assuming that the arbitrator's reinstatement of Stritzinger did represent an accommodation of National Labor Relations Act (NLRA) policies, the Board held that by not ordering backpay, the arbitrator had rendered an award incompatible with the Board's established policy of restoring the *status quo ante* wherever possible.

## II.

The statutory issue before the Board in this case was not whether Hammermill had just cause to suspend Stritzinger for five months without pay. Rather, the unfair labor practice issue went to the legality, under the NLRA, of Hammermill's admitted *motive* (and clearly the "but for" cause)[5] for enhancing Stritzinger's punishment beyond the two week suspension meted out to the others who, like Stritzinger, had no prior record of disciplinary problems.[6] That motive was found by the arbitrator to have no logical or contractual basis. If, as stated by the Board, that motive together with its practical effect, violated section 8(a)(3), then it follows that the objective existence of just cause for Stritzinger's punishment failed to negate the illegality of Hammermill's enhancement of the admittedly lenient punishment. "Despite the concurrent existence of a justifiable cause for discharge, the employer violates the act if anti-union animus was the 'real motive.' "

115 (1980); *Indiana & Mich. Elec. Co. v. NLRB,* 599 F.2d 227 (7th Cir. 1979). Since that time, the Eighth Circuit seems to have followed the Third and Seventh. *See NLRB v. Armour-Dial, Inc.,* 638 F.2d 51, 55 (8th Cir. 1981). *See* Part III *infra.*

4. Said the ALJ: "I credit the three employee witnesses, of course, and I find Stritzinger did not provoke, or in any way cause or encourage the other eight men to strike."

Said the arbitrator: "[T]here is no evidence before me to indicate that Stritzinger was the ring leader on the evening in question. In that sense, the company's basis of differentiation fails."

Finally, at oral argument before this court, Hammermill's counsel all but conceded the issue: "I think that the so-called leadership issue is really a red herring and I will concede it may be one that we fished for a bit."

5. There is ample evidence to support the finding that Hammermill's post hoc assertion as to its reason for dismissing Stritzinger—that he allegedly instigated the illegal action—was, at best, unfounded. *See* note 4 *supra.* Consequently, we see no basis for rejecting that finding, which was reached by both the ALJ and the arbitrator. We proceed, then, on the assumption that Hammermill fired Stritzinger for the reasons stated in its letter of discharge. *See* note 1 *supra.*

6. Because reinstatement without backpay failed to eliminate the disparity between Hammermill's treatment of Stritzinger, on the one hand, and Hughes and Gallagher, on the other, the unfair labor practice issue plainly survived the arbitral award of reinstatement. The issue to which we refer is, of course, not whether the arbitrator's decision to reinstate Stritzinger without backpay was itself an unfair labor practice, but rather whether Stritzinger's 4½ -month layoff without pay was the enduring consequence of the initial illegal discharge. Thus we cannot agree with the dissent when it suggests that, given the reduction of the discharge sanction to a 5-month suspension prior to any proceedings before the Board, compliance with the reinstatement award necessarily insulated Hammermill's conduct from further scrutiny under the NLRA.

*Edgewood Nursing Center, Inc. v. NLRB,* 581 F.2d 363, 368 (3d Cir. 1978).[7]

In *NLRB v. General Warehouse Corp.,* 643 F.2d 965 (3d Cir. 1981), we held that it was no abuse of discretion for the Board to reverse the outcome of an arbitral decision that upheld, as a *contractual* matter, the discharge of an employee, absent "some evidence that the *statutory* issue has actually been decided." *Id.* at 969 (emphasis added); *see also id.* at 975 n.6 (Aldisert, J., dissenting). In that case an employee, Coon, was allegedly discharged for excessive absenteeism, but suspected that the real reason for his discharge was his vehement opposition to the employer on various collective bargaining issues. Coon grieved his discharge to arbitration, raising the issue whether the discharge was actually in retaliation for his concerted union activities. 643 F.2d at 974 n.3 (Aldisert, J., dissenting). However, the arbitrator made no findings on the employer's motive for discharge. Instead, the arbitrator held simply that, in an objective sense, there had been ample just cause for the termination.

Coon then raised the issue of discrimination under § 8(a)(3) before the Board. The Board refused to defer to the arbitrator's award and found that the discharge was discriminatory under § 8(a)(3). This court enforced the Board's order. In doing so, we declined to hold (as the Board had held) that the arbitrator's award had been "clearly repugnant" to the purposes and policies of the NLRA, thus avoiding the question whether the Board was required to defer under *NLRB v. Pincus Brothers, Inc.-Maxwell,* 620 F.2d 367 (3d Cir. 1980). Instead, we chose to adopt the rule, developed in a line of cases beginning with *Monsanto Chemical Co.,* 130 N.L.R.B. 1097 (1961), that had expanded upon the three criteria for arbitral deferral originally adopted by the Board in *Spielberg Manufacturing Co.,* 112 N.L.R.B. 1080 (1955), and embellished in *International Harvester Co.,* 138 N.L.R.B. 923 (1962), *enforced sub nom. Ramsey v. NLRB,* 327 F.2d 784 (7th Cir.), *cert. denied,* 377 U.S. 1003, 84 S.Ct. 1938, 12 L.Ed.2d 1052 (1964).[8]

*Monsanto Chemical* and its progeny[9] have devised various formulae to refine the

7. *See, e. g., NLRB v. Garry Mfg. Co.,* 630 F.2d 934, 945 (3d Cir. 1980); *L'Eggs Prods., Inc. v. NLRB,* 619 F.2d 1337, 1341 (9th Cir. 1980); *NLRB v. Wilson Motor Freight Co.,* 604 F.2d 712, 722 (1st Cir. 1979), *cert. denied,* 445 U.S. 962, 100 S.Ct. 1650, 64 L.Ed.2d 238 (1980); *John Klann Moving & Trucking Co. v. NLRB,* 411 F.2d 261, 263 (6th Cir.), *cert. denied,* 396 U.S. 833, 90 S.Ct. 88, 24 L.Ed.2d 84 (1969); *Illinois Ruan Transp. Corp. v. NLRB,* 404 F.2d 274, 278 (8th Cir. 1968).

8. In *Spielberg* the Board held that

the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act. In these circumstances we believe that the desirable objective of encouraging the voluntary settlement of labor disputes will best be served by our recognition of the arbitrators' award.

112 N.L.R.B. at 1082. In *International Harvester,* the Board declined to address basic contract and statutory questions pertinent to the case before it "since it plainly appears to us that the award is not *palpably wrong.*" 138 N.L.R.B. at 929 (emphasis added). The Board restated its *Spielberg* rule as follows:

If complete effectuation of the Federal policy is to be achieved, we firmly believe that

the Board, which is entrusted with the administration of one of the many facets of national labor policy, should give hospitable acceptance to the arbitral process as "part and parcel of the collective bargaining process itself," and voluntarily withhold its undoubted authority to adjudicate alleged unfair labor practice charges involving the same subject matter, unless it clearly appears that the arbitration proceedings were tainted by fraud, collusion, unfairness, or serious procedural irregularities or that the award was clearly repugnant to the purposes and policies of the Act.

*Id.* at 927 (footnote omitted).

9. *See, e. g., St. Lukes Memorial Hosp., Inc. v. NLRB,* 623 F.2d 1173, 1178–79 (7th Cir. 1980); *NLRB v. Davol, Inc.,* 597 F.2d 782, 786 (1st Cir. 1979); *Stephenson v. NLRB,* 550 F.2d 535 (9th Cir. 1977); *Banyard v. NLRB,* 505 F.2d 342 (D.C.Cir.1974); *John Klann Moving & Trucking Co. v. NLRB,* 411 F.2d 261, 263 (6th Cir.), *cert. denied,* 396 U.S. 833, 90 S.Ct. 88, 24 L.Ed.2d 84 (1969); *Illinios Ruan Transp. Corp. v. NLRB,* 404 F.2d 274, 280 (8th Cir. 1968); *Hawkins v. NLRB,* 358 F.2d 281, 284 (7th Cir. 1966); *Raytheon Co.,* 140 N.L.R.B. 883 (1963), *enforcement denied on other grounds,* 326 F.2d 471 (1st Cir. 1964); *Suburban Motor Freight, Inc.,* 247 N.L.R.B. No. 2, 103 L.R.R.M. 1113 (Jan. 8, 1980).

landmark *Spielberg* test.[10] However, central to them all is a notion that where the propriety of employee discipline is upheld under the terms of a collective bargaining agreement, the Board need not reject a complaint under § 8(a)(3), based on the same discipline, unless there is some indication that in deciding the contract issue, the arbitrator had also decided the questions necessary to the resolution of the statutory inquiry.

*Pincus Brothers* provides an example of a case in which such an indication was present. There, we dealt with a dismissal precipitated by an employee's distribution of a leaflet. Both the arbitrator and Board treated the dismissal on this ground. The only question was whether dismissal for distributing that particular leaflet was permissible under the law of the shop and the NLRA. By finding that the leafletting was justifiable grounds for dismissal, the arbitrator at least arguably concluded that the leafletting was unprotected both by the NLRA and the law of the shop. For this reason the Board did not, and could not have, upset the arbitral decision simply by applying the rule grounded in *Monsanto*.

As *Pincus* illustrates, the employer's motives for disciplinary action will themselves often be ambiguous. At arbitration the employer and the employee will each attempt to convince the arbitrator that the "real" reasons for discipline were, or were not, justified under the law of the shop, which may, as in *Pincus*, encompass congruent statutory and contractual issues. Thus, when the arbitrator finds that the employer had "just cause" to discipline the employee, his award is typically at least "susceptible" to the interpretation that "there is no causal connection of any anti-union bias and the loss of the job." *Edgewood Nursing Center, Inc. v. NLRB*, 581 F.2d at 368. Because the absence of such a causal connection would remove the 8(a)(3) taint from the employer's acts, the Board may then be obliged to defer to the award under the standard of *Douglas Aircraft Co. v. NLRB*, 609 F.2d 352 (9th Cir. 1979), specifically approved by this court in *Pincus*: "If the reasoning behind an award is susceptible of two interpretations, one permissible and one impermissible, it is simply not true that the award was 'clearly repugnant' to the Act." 609 F.2d at 354.

An arbitrator's award may also evince resolution of unfair labor practice issues when the collective bargaining agreement, whose terms it is the arbitrator's duty to construe, expressly prohibits discriminatory discharges based on union activity. *See, e.g. Gulf States Asphalt Co.*, 200 N.L.R.B. 938, 939 n.11, 940 n.12 (1972); *Airco Industrial Gases—Pacific*, 195 N.L.R.B. 676, 677 (Member Kennedy, dissenting).

On the other hand, the Board has determined that where a disciplined employee fails even to *raise* the unfair labor practice issue in the arbitral proceeding, subsequent Board inquiry into that issue will not be limited by an arbitral award favorable to the employer. *Suburban Motor Freight, Inc.*, 247 N.L.R.B. No. 2, 103 L.R.R.M. 1113 (Jan. 8, 1980). But failure to raise the statutory issue before the arbitrator is not a sine qua non for refusal to defer even assuming compliance with the three *Spielberg* criteria. Though the discharged employee may vigorously argue the issue of anti-union discrimination to the arbitrator, it is not unheard of for an arbitrator to specifically disclaim any intent to decide the issue of discriminatory motive, and base an award solely on the existence of objective grounds for discipline. *Monsanto Chemical* was such a case. There, having heard evidence and arguments on the unfair labor practice issues, the arbitrator stated:

"I have given a good deal of thought to the dilemma which arises out of the dual jurisdiction over the essence of the unfair labor practice charges. Because the NLRB has exclusive jurisdiction in the event of a conflict, and because I believe the case can be decided on other grounds, I have chosen to ignore for purposes of decision the allegations herein contained that Till's Union activities played a part in his discharge."

---

**10.** Some of these formulae are collected in *General Warehouse*, 643 F.2d at 969 & nn. 16 & 17.

130 N.L.R.B. at 1099. A similar approach was evidenced by the arbitrator's award in *Kalamazoo Typographical Union Local 122,* 193 N.L.R.B. 1065, 1074 (1971). *See also* Note, *The NLRB and Deference to Arbitration,* 77 Yale L.J. 1191, 1204–05 (1968).

■ It is thus inevitable that the ground upon which the arbitrator acts be subjected to some scrutiny before the Board or a court can conclude that the award disposes of the statutory issue raised before the Board. After all, the Board defers not because the arbitrator could have reached and decided unfair labor practice issues in a grievance arbitration, but because in the very process of deciding the contractual issue, the arbitrator may necessarily dispose of the question whether the employee's legitimate rights under § 7 of the NLRA were interfered with impermissibly, within the meaning of § 8(a).[11] Thus in a case where the statutory issue—*viz.,* the identity of the "but for" cause for discipline—and the contractual issue—*viz.,* the existence or nonexistence of an objective justification for discipline—are evidently separate and distinct, and it clearly appears that only the latter has been treated by the arbitrator, the rationale for deferral necessarily evaporates. In *General Warehouse,* for instance, there was a dispute over the impetus for Coon's dismissal, but the arbitrator's finding of "objective" just cause seemed to indicate to us that the statutory issue of motive had been completely pretermitted by the arbitrator. Today, we hold that because the arbitrator definitely declined to decide the statutory issue lurking in Stritzinger's grievance, the Board committed no abuse of discretion in undertaking a de novo review of that issue.

Because it is clear that many of the factual and contractual issues bearing on the unfair labor practice issue were, in this case, presented to the arbitrator, and because he wrote an opinion acknowledging his complete familiarity with the relevant evidence, it is especially important here that we hew faithfully to the rule set forth in *General Warehouse, viz.,* that the Board defer to the arbitral decision given "some evidence that the statutory issue has been decided." [12] We believe that this case, however, calls for a Board decision on the merits because here, even more than in *General Warehouse,* we are abundantly assured that the arbitrator, although presented with evidence of the motive for discipline, specifically and clearly declined to reach the question whether that motive was statutorily proscribed.

■ As a preliminary matter, we note that the collective bargaining agreement

---

**11.** It is for this reason that the Board overruled its much-criticized decision in *Electronic Reprod. Serv. Corp.,* 213 N.L.R.B. 758 (1974), which had held that whether or not statutory issues had been raised, the Board would defer to arbitral awards absent "unusual circumstances . . . which caused the failure to introduce . . . evidence [of statutorily proscribed discrimination] at the arbitration proceeding." *Id.* at 762 (footnote omitted).

In the view of one commentator, and subsequently a majority of the Board,

[t]he inference to be drawn from [*Electronic Reproduction*] is that *although the contract and statutory issues are different,* the union's interests may not coincide with the individuals', *and the statutory issue was in no way litigated or determined,* the Board will deprive these individual employees of their statutory rights under the guise of deferring to and encouraging arbitration. One's mind would need to be very fertile, indeed, to conjure up a more shocking sacrifice of individual rights on the altar of institutionalism.

Schatzki, *Majority Rule, Exclusive Representation, and the Interests of Individual Workers: Should Exclusivity be Abolished?,* 123 U.Pa.L. Rev. 897, 909 n.32 (1975), *quoted in Suburban Motor Freight, Inc.,* 247 N.L.R.B. No. 2, 103 L.R.R.M. at 1114 (emphasis added).

**12.** *Cf. Bloom v. NLRB,* 603 F.2d 1015, 1020 (D.C.Cir.1979) ("The key . . . is the evidence presented to the arbitration panel.")

[T]he directive of the Court of Appeals for the District of Columbia [in *Banyard v. NLRB,* 505 F.2d 342 (1974),] that deference is an abuse of discretion unless the arbitrator's decision is congruent to the Board's, both as to issues and disposition, will effectively destroy the use of arbitral resources to resolve overlapping questions of contractual and statutory breach; the temptation will be very great indeed for the party losing before the arbitrator to try the case again before the Board.

R. Gorman, Basic Text on Labor Law 742 (1976).

governing the arbitrator's award apparently contained no anti-discrimination clause, thus raising some question whether the arbitrator was even authorized to set aside discipline for which objective "just cause" existed.[13]

Secondly, it is undisputed that the arbitration case was litigated not as a case involving anti-union discrimination under § 8(a)(3), but solely as a just cause matter. The legal standard embodied in § 8(a)(3) was neither discussed nor even raised by the parties to that proceeding.

Finally, and most importantly, in the present case there is only one explanation for the *enhancement* of Stritzinger's punishment—his status as a union official. The arbitrator specifically found that Hammermill's motive for enhancing Stritzinger's punishment was the motive explained in Hammermill's letter. And the arbitrator also specifically found that the explanation for the discipline had no contractual basis. Thus his award could not have been construed as a finding that the collective bargaining agreement had heightened Stritzinger's responsibilities as union steward, so as to affect the balance of policies embodied in § 7 of the NLRA, and thereby the determination of discrimination under § 8(a)(3). Rather, the arbitrator refused to order backpay on the ground that Stritzinger's misconduct warranted, in an objective sense, five months of suspension, far more than he would have suffered had he not been a union steward. Although the first of these alternate holdings would have spoken to an unfair labor practice issue, the latter would not.

In our view, the arbitrator's decision came close to stating the sort of "hands-off" approach to the statutory issue that was displayed by the arbitrators in *Monsanto Chemical* and *Kalamazoo Typographical Union.* There was no question, even in the arbitrator's mind, as to what motive prompted Hammermill to discipline Stritzinger more severely than Hughes or Gallagher. Nor was there any question that the actual motive was not valid under the collective bargaining agreement. Thus it cannot plausibly be argued that the arbitrator was concerned about Hammermill's motive, or that his decision to uphold Stritzinger's enhanced level of punishment somehow constituted a finding that Hammermill's motive was legitimate. As Hammermill's counsel before the arbitrator explained to this court at oral argument, the arbitration case "was dealt with solely as a just cause matter." We conclude, therefore, that the Board acted correctly in undertaking a de novo review of the statutory issues raised in the complaint issued on behalf of Stritzinger.

### III.

■ We now turn to the question whether the Board erred in concluding that the disparity of treatment between Stritzinger, on the one hand, and Hughes and Gallagher, on the other, constituted discrimination prohibited by § 8(a)(1) & (3).[14]

[O]nce it has been proved that the employer engaged in discriminatory conduct which could have adversely affected employee rights to *some* extent, the burden is upon the employer to establish that he was motivated by legitimate objectives since proof of motivation is most accessible to him.

13. Of course, the rationale for deferral is undercut if he was not so authorized, since the arbitrator "has no general authority to invoke public laws that *conflict* with the bargain between the parties." *Barrentine v. Arkansas-Best Freight Sys., Inc.,* 450 U.S. 728, 744, 101 S.Ct. 1437, 1446, 67 L.Ed.2d 641 (1981) (quoting *Alexander v. Gardner-Denver Co.,* 415 U.S. 36, 53, 94 S.Ct. 1011, 1022, 39 L.Ed.2d 147 (1974)) (emphasis added).

14. It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title [section 7 of the NLRA];

\* \* \* \* \* \*

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .;

\* \* \* \* \* \*

29 U.S.C. § 158(a) (1976).

*NLRB v. Great Dane Trailers, Inc.*, 388 U.S. 26, 34, 87 S.Ct. 1792, 1798, 18 L.Ed.2d 1027 (1967) (emphasis in original); *accord, e. g., United Dairy Farmers Cooperative Association v. NLRB*, 633 F.2d 1054, 1061 (3d Cir. 1980). We believe that Hammermill's discrimination against Stritzinger could readily have had an adverse affect on employee rights. The mere office thus became a burden, unilaterally imposed by the employer, even under circumstances where the office carried no extra burden under the terms of the contract. The holding of union office, after all, is the essence of protected union activities; [15] union status may not, without more, be treated by employers as an open invitation for sanctions. All other things being equal, the marginal effect of this burden would be to "discourage members from holding union office" and thus "no doubt have an inherently adverse effect on employee rights." *Indiana & Michigan Electric Co. v. NLRB*, 599 F.2d 227, 230 (7th Cir. 1979).

Secondly, we hold that where an employer offers a contractually unsupportable explanation for imposing more severe sanctions on a union official than it imposes upon an ordinary member for similar misconduct, it has failed to establish, as required by *Great Dane*, that it was motivated by a legitimate objective. In this case, the employer initially assigned only one reason for its disparate treatment of Stritzinger, a justification found by the arbitrator to be unacceptable under the collective bargaining agreement and in the general factual context of this case. We see no reason for reviewing that finding at this stage. Reconsideration of the contract issue seems particularly inappropriate here, because of all the forums in which this case has been heard, including this court, the arbitration proceeding was the one most suitable—and the one bargained for—to determine the meaning of the collective bargaining agreement in this respect. *United Steelworkers of America v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599, 80 S.Ct. 1358, 1362, 4 L.Ed.2d 1424 (1960). *See generally Lud-*

*wig Honold Manufacturing Co. v. Fletcher*, 405 F.2d 1123 (3d Cir. 1969).

Thus we have not the slightest doubt that the employer's decision to enhance Stritzinger's punishment, without a legitimate business reason, and based solely on his union office, constituted a violation of § 8(a)(3). Ironically, however, we reach a result consistent with the majority of the Board panel, even though the panel relied on precedent overruled by this court's decision in *Gould, Inc. v. NLRB*, 612 F.2d 728 (3rd Cir. 1979), *cert. denied*, 449 U.S. 890, 101 S.Ct. 247, 66 L.Ed.2d 115 (1980). We do not, however, mean to express any lack of support for our decision in *Gould* and its underlying reliance on the reasoning of *Indiana & Michigan Electric Co. v. NLRB*, 599 F.2d 227 (7th Cir. 1979).

*Gould* established that where a collective bargaining agreement explicitly requires union officers and representatives to use every reasonable effort to terminate an unauthorized "work stoppage," an employer may single out for disciplinary discharge a union steward who fails to take affirmative steps to terminate that work stoppage. *Gould, Inc. v. NLRB*, 612 F.2d at 730 & n.3. *Gould* is not, of course, directly applicable here because Stritzinger had no such contractual duty, and the arbitrator so found. Somewhat closer to this case, but still tangential, is *Indiana & Michigan Electric Co. v. NLRB*, 599 F.2d 227 (7th Cir. 1979), the decision from which *Gould* adopted its reasoning. *Indiana* also permitted an employer to discipline union stewards more severely than rank-and-file members for participating in unauthorized refusals to work, because participation in the unlawful strike by the stewards constituted not only a violation of their duties as employees, but a repudiation of their responsibilities as union officials. 599 F.2d at 230. However, the contract in *Indiana* was somewhat less emphatic, and less specific, in spelling out the duties of union officers than was the contract in *Gould*. In *Gould*, the contract required that

---

**15.** *General Motors Corp.*, 218 N.L.R.B. 472, 477 (1975), *enforced mem.*, 535 F.2d 1246 (3d Cir. 1976); *accord, Indiana & Mich. Elec. Co. v. NLRB*, 599 F.2d 227, 230 (7th Cir. 1979).

[i]n the event of an illegal, unauthorized or uncondoned strike, work stoppage, interruption or impeding of work, the Local and International Union and its officers shall immediately take positive and evident steps to have those involved cease such activity. These steps shall involve the following:

Within not more than twenty-four (24) hours after the occurrence of any such unauthorized action, the Union, its officers and representatives shall publicly disavow same by posting a notice on the bulletin boards throughout the plant. The Union, its officers and representatives shall immediately order its members to return to work, notwithstanding the existence of any wild-cat picket line. The Union, its officers and representatives shall refuse to aid or assist in any way such unauthorized action.

The Union, its officers and representatives, will in good faith, use every reasonable effort to terminate such unauthorized action.

612 F.2d at 730 n.3. In *Indiana*, on the other hand, the contract, in general language, merely stated

that the employees covered by this Agreement . . . will not be called upon or permitted to cease or abstain from the continuous performance of the duties pertaining to the positions held by them . . . .

599 F.2d at 228. In a case where no anti-union motive is shown, held Judge Tone, disparate punishment of union officials covered by such an agreement could not be considered "inherently destructive" of important employee rights. *Id.* at 232.

*Indiana* thus suggests a short step beyond *Gould*. It allows a court to find that an employee's status as a union official carries responsibilities to take affirmative steps to prevent unlawful work stoppages, even absent the emphatic and unmistakably clear language of individual duty in *Gould*. Both parties now before us seemed to urge at oral argument that we take this progression

to its limit; they urge us to read in *Indiana* a rule allowing employers to single out for harsher punishment union officials who merely participate in illegal strikes *regardless* of the language in their collective bargaining agreements.[16] Of course, such an extension would foster the unacceptable result that employers and unions could no longer agree upon the responsibilities under the contract of union officials. Instead, an inflexible approach would be compelled in every case, regardless of the particular circumstances. Not only do we reject that approach as unsound, but we also note that the factual context in which *Indiana* arose would forbid us from reading it as anything more than a determination that, within the context of the labor agreement there at issue, the actions of the union stewards violated duties with which the rank-and-file were not burdened.

Given that the "status" of union stewardship, without more, is not a criterion upon which discipline is warranted, 599 F.2d at 230, then whether responsibility does, or does not, accompany the status of union stewardship is a conclusion that must be reached by construing the contract, rather than a condition dictated purely by operation of law. The decision in *Indiana* was tied to contract language that imposed a higher duty on union stewards than the duty imposed on Stritzinger by the labor contract in this case. Here, the contract stated only that "[t]he Union agrees that there will be no strikes, slowdowns, or work stoppages." In *Indiana*, on the other hand, the agreement specifically noted that the services to be provided were essential to the operation of a public utility, "and to the welfare of a public dependent thereon." Thus the contract, "in consideration" of this strong public interest, provided that employees "will not be called upon *or permitted to* cease or abstain from the continuous performance of their jobs." 599 F.2d at 228 (emphasis supplied). By use of this language, the contract implicitly differentiated between two tiers of union membership—

---

16. For instance, the Board's counsel asserted that were this court to follow the rationale of

*Indiana*, we could not enforce the order under review.

those who could engage in strike activity, and those who could wield the additional power to promote or deter strike activity by others—and imposed higher duties on members of the latter tier. Even arguing strictly from the face of the contract in this case, it would thus be technically consistent to conclude that Stritzinger's punishment here penalized the exercise of a protected right, while the differential punishments in *Indiana* did not. But we have more to go on, here, than the mere face of the contract. In this case the arbitrator made specific findings that *negated* the inference that any "higher responsibilities" accompanied Stritzinger's status as a union steward.[17]

Thus, the result we reach is not at all inconsistent with *Gould* and *Indiana*. Nor do we see any need to reconsider our decision in *Gould*. The Board argues vigorously on this appeal that it is improper to allow an employer to enforce the special anti-strike obligations of union officials through the sanction of discharge. It argues that the breach of such an obligation is an internal union matter and that "a major policy of the Act is to 'insulate employees' jobs

from their organizational rights' and to permit them to be 'good, bad or indifferent members . . . without imperiling their livelihood.'" Brief for the NLRB 17 (quoting *Radio Officers' Union v. NLRB*, 347 U.S. 17, 40, 74 S.Ct. 323, 335, 98 L.Ed. 455 (1954)). Because we have already determined that Stritzinger violated no special anti-strike obligation as union official, it is unnecessary, in the strict sense, for us to reiterate here our view of how an employer may enforce that obligation. However, we caution the Board that insofar as *Gould* holds that an employer may use discipline as a means of enforcing the individual duties of union officials, we continue to adhere to that precedent.[18]

### IV.

Having concluded that the arbitrator clearly failed to decide the statutory issue in this case, and that therefore the Board did not abuse its discretion in failing to defer, we express no opinion whether the arbitrator's award was or was not, in any sense, "clearly repugnant to the purposes and policies of the Act."[19] The Board's

17. For this reason, we express no view as to how we would have interpreted Stritzinger's contractual duty had we been asked to interpret the bare words of the contract, lacking the arbitral interpretation bargained for by the parties to the agreement.

18. The Board would also have this court overrule *Gould* on the ground that *Complete Auto Transit, Inc. v. Reis*, 451 U.S. 401, 101 S.Ct. 1836, 68 L.Ed.2d 248 (1981) expresses a determination by the Supreme Court that Congress did not intend to allow employers to obtain money damages against individual employees who violate their collective bargaining agreements.

This argument is meritless. In *Complete Auto*, the Court acknowledged that Congress approved of disciplinary discharges of employees who violated collective bargaining agreements. *Id.* 451 U.S. at 415 & n.16, 101 S.Ct. at 1844 & n.16. A fortiori, an employer's disciplinary suspension of a contract violator is protected under the NLRA. Therefore *Gould*, a case in which an employee was fired for violating his individual duties under the contract, is perfectly consistent with *Complete Auto*.

19. We have not been presented with any evidence that, after reinstating Stritzinger, the ar-

bitrator went on to decide the surviving statutory question arising out of the remaining disparity between the treatment of Stritzinger, on the one hand, and Hughes and Gallagher, on the other. *See* Part II *supra*. Had we been presented with such evidence, it is perhaps arguable that, as the dissent suggests, we could have gone on to find that the arbitrator's failure to award backpay would not have been "clearly repugnant to the purposes and policies" of the Act's remedial provision which directs the Board to order such affirmative action "as will effectuate the policies of" the NLRA. 29 U.S.C. § 160(c) (1976). *Cf. Ohio Ferro-Alloys Corp.*, 209 N.L.R.B. 577, 577 n.2, 583 (1974) (discharged employee properly reinstated without backpay, but the Board declines to decide whether the "but for" cause of discharge was lawful or unlawful). *But see Cessna Aircraft Co.*, 220 N.L.R.B. 873, 875 (1975) (arbitrator's award of reinstatement without backpay "is repugnant to the purposes and policies of the Act"). *See generally Sea-Land Serv., Inc.*, 240 N.L.R.B. 1146, 1147 n.4 (1979). However, the rule in *General Warehouse* obviates the need for an inquiry into this last question (apparently a novel one in this circuit) for, as we have found, it is quite plain that the arbitrator did not even address, much less de-

order will be enforced insofar as it requires the employer to treat Stritzinger, Hughes, and Gallagher on an equal basis. The petition for review will be denied.

A. LEON HIGGINBOTHAM, Jr., Circuit Judge, concurring.

I agree fully with the majority's conclusion that the Board's application for enforcement should be granted and the Hammermill Paper Company's petition for review denied. I also concur with the majority's reasoning on the appropriateness of the Board's refusal to defer to an arbitration award where the arbitrator did not decide the unfair labor practice issue. I write separately only to express my views on the issue of whether an employer commits an unfair labor practice when it disciplines a union officer more severely than rank-and-file workers similarly situated.

### I.

The Hammermill Paper Company employs four "tour crews" of maintenance mechanics at its Erie, Pennsylvania mill. Thomas Stritzinger was a ten-year employee at the mill and the union steward for Tour Crew D. On the night in question, Stritzinger had agreed to work the Tour Crew A shift as a substitute for a fellow employee. He was not serving as a steward when the work stoppage occurred. All of the negotiations over whether Tour Crew A would build the fire transpired between the mill foreman and the union steward for Tour Crew A. Yet, when the company sent out its disciplinary notices, Stritzinger was informed that he had been fired. Of the remaining members of Tour Crew A, six who had participated in an earlier work stoppage were also fired and two who had clean records were suspended for two weeks. Stritzinger had a clean record prior to the work stoppage at issue but was fired all the same because he was a union steward at the mill. The contract between the company and the union contained a no-strike clause but did not impose an explicit duty on union officers and stewards to end any illegal work stoppages.

### A. The Third Circuit's Decision in Gould, Inc. v. NLRB

In *Gould, Inc. v. NLRB*, 612 F.2d 728, 730 (3d Cir. 1979), we considered "whether it was an unfair labor practice for the employer to single out for disciplinary charge a union steward who participated with a number of rank-and-file union members in an illegal work stoppage where the steward failed to discharge his contractual obligation to take steps to terminate that work stoppage." There the collective bargaining agreement contained a no-strike clause as well as a company authorization to discipline or discharge employees who participated in illegal work stoppages. The contract further provided that:

> In the event of an illegal unauthorized or uncondoned strike, work stoppage, interruption or impeding of work, the Local and International Union and its officers shall immediately take positive and evident steps to have those involved cease such activity. These steps shall involve the following:
>
>> Within not more than twenty-four (24) hours after the occurrence of any such unauthorized action, the Union, its officers and representatives shall publicly disavow same by posting a notice on the bulletin boards throughout the plant. The Union, its officers and representatives shall immediately order its members to return to work, notwithstanding the existence of any wild-cat picket line. The Union, its officers and representatives shall refuse to aid or assist in any way such unauthorized action.
>
>> The Union, its officers and representatives, will in good faith, use every reasonable effort to terminate such unauthorized action.

*Id.* at 730–31. The court concluded that, since the contract gave the employer the power to fire illegal strikers and imposed an affirmative duty on union officers to at-

cide, the question whether the disparity between Stritzinger's and Hughes's and Gallagh-

er's treatment constituted a violation of § 8(a)(3) of the Act.

tempt, in good faith, to end the strike, the employer did not commit an unfair labor practice by discharging a union steward who breached his contractual duties. *Id.* at 733.

I believe that this court's opinion in *Gould* was far too expansive and ladened with dicta which stated precepts far beyond the unique facts of that case, but *Gould* is the rule of our circuit unless and until it is changed by the full court sitting *en banc.* I question the *Gould* court's reliance on the Seventh Circuit's decision in *Indiana & Michigan Electric Co. v. NLRB,* 599 F.2d 227 (7th Cir. 1979).

In *Indiana & Michigan Electric,* a union steward was discharged under a collective bargaining agreement much less specific than *Gould* in the duty it imposed upon union officials. The court found no unfair labor practice because:

> Differentiating between union officers and rank-and-file in meting out discipline for participating in a clearly illegal strike did not penalize or deter the exercise of any protected employee right. We believe the employer was entitled to take into account the union officials' greater responsibility and hence greater fault, and that ·the resulting different treatment of union officials could not be reasonably considered inherently destructive of important employee rights.

*Id.* at 232 (footnote omitted). Insofar as the Seventh Circuit based its conclusion on the theory that a union steward's status conveyed rights and responsibilities, not specifically enumerated in the contract, which justified more severe discipline, I would reject its decision completely. The Board in its brief in the present case argues convincingly that:

> Shop stewards may receive certain special treatment to accommodate their role in processing grievances. Thus, contracts frequently provide that stewards get time off with pay for grievance handling (as in the contract in this case, A. 202a) or extra protection against layoffs ("superseniority"). See Bureau of National Affairs, *Basic Patterns in Union Contracts,*

at 36–37 (8th ed. 1975). However, such special treatment is statutorily permitted only to the extent that it reflects the union's "legitimate and substantial" need for having the grievance-handling function performed in the plant, and is incorporated in the parties' agreement. See *NLRB v. Milk Drivers & Dairy Employees, Local 338,* 531 F.2d 1162, 1165–1167 (2d Cir. 1976); *Teamsters Local 20 v. NLRB,* 610 F.2d 991, 994–995 (D.C.Cir. 1979); *Paintsmiths, Inc. v. NLRB,* 620 F.2d 1326, 1330–1331 (8th Cir. 1980). *The special benefits are thus confined to a legitimate and agreed-upon need; they clearly do not justify exposing the stewards to a countervailing set of obligations unilaterally devised and enforced by the employer.* But see, *Indiana & Michigan Electric Co. v. NLRB,* 599 F.2d 227, 231, n.10 (7th Cir. 1979), and Co. Br. p. 25.

Brief for the NLRB at 10 n.5 (emphasis added).

Therefore, I would limit the rule in *Gould* to cases where the collective bargaining agreement is as precise in its obligations as it was in *Gould* and the employee in question is serving in an official capacity at the time of the incident. Stritzinger's discharge constitutes an unfair labor practice in my view under both circumstances. The collective bargaining agreement imposed no affirmative duty on a union steward and Stritzinger was not functioning as a steward for Tour Crew A.

ADAMS, Circuit Judge, dissenting.

I respectfully dissent.

It is conceded that on the night of February 18, 1979, nine employees of the Hammermill Paper Company improperly refused to proceed with an operation that would have permitted the production at the plant to go forward. There is no doubt, either, that there was no real safety concern motivating the actions of the employees. As a result of the costly and unjustified interruption in production, Hammermill imposed discipline on the employees: It discharged six of the employees who had received a previous warning, and suspended for two

weeks the employees who had a "clean" record. As for Thomas Stritzinger, who was a union steward in the plant, but not on the operation in question, it imposed a discharge penalty. Stritzinger also had a "clean" record.

All the employees who were discharged, including Stritzinger, filed a grievance, and the matter was assigned to an arbitrator. After hearing the witnesses and carefully reviewing the record, the arbitrator stated:

We are left then with the matter of the appropriate penalties. I believe that the evidence justifies the finding that the men acted in an egregiously improper manner, that they refused to perform work tasks assigned to them, that whatever their concern for safety, it was at best premature, that they should have proceeded to do the tasks assigned to them. The simple reasons for their compliance rests on the needs of industrial production upon which their well-being and continued livelihood depends. The needs of ordinary production requires that supervision must be given the authority to make assignments. If there had come a time when safety hazards were involved, there would have been ample time for them to make their stand and to refuse to do the work assigned to them on the grounds of safety. Their failure to perform work was the type of conduct that deserves disciplinary action but in light of the total situation it does not deserve discharge.

... In this case, I feel that to award backpay to these employees would be interpreted as a reward for their activity on the night in question. It was not conduct which ought to be rewarded. It was conduct that ought to be condemned in the most stringent of terms. Their return to work is based, in part, on the procedural defects in the method used to discharge them, and in part on the fact that the disparity meted out to the employees involved is just too great and not justified by their prior records. Accordingly, in light of all the testimony and evidence, the conclusion will be that the seven employees should be returned to work without backpay....

Despite these determinations by the arbitrator, an expert in dealing with employer-employee matters, the NLRB filed an unfair labor charge against Hammermill, on the ground that not to give Stritzinger five months backpay would constitute a violation of 8(a)(3).

Although Stritzinger had already been reinstated as an employee of Hammermill in accordance with the arbitrator's award, the ALJ declared that the "case should not be dismissed in deference to the Arbitrator's decision, because the failure to compensate Stritzinger is contrary to Board law." The ALJ ordered that Hammermill pay five months backpay to Stritzinger. The National Labor Relations Board affirmed the ALJ, and filed a petition seeking enforcement of the backpay order.

In *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080 (1955), the Board set forth its standards for deferring to arbitrators' awards. It stated that it would defer to an arbitrator's award if: (1) the proceedings have been fair and regular; (2) the parties agreed to be bound; and (3) the decision was not "clearly repugnant" to the purposes and policies of the Act. *Spielberg*, 112 N.L.R.B. at 1082.

There is no question that the proceedings before the arbitrator here were "fair and regular" and that the parties to the arbitration "agreed to be bound." The principle question is whether the decision of the arbitrator in declining to awarding backpay to Stritzinger was "clearly repugnant" to the purposes and policies of the Act. Since there is a clear finding that Stritzinger acted "in an egregiously improper manner" in refusing to perform work tasks assigned to him, I believe that the decision of the arbitrator in declining to pay Stritzinger five months wages for the time he was not working is not "clearly repugnant" to the Act. The Act itself does not require any backpay. Section 10(e). And certainly a decision not to pay backpay to one who has been laid-off after participating in a blatant interruption with production is not inconsistent with the purposes and policies of the Act.

As explained in *International Harvester Co.*, 138 N.L.R.B. 923 (1962), the source of the Board's deferral policy is rooted in both congressional and Supreme Court pronouncements:

> If complete effectuation of the Federal policy is to be achieved, we firmly believe that the Board, which is entrusted with the administration of one of the many facets of national labor policy, should give hospitable acceptance to the arbitral process as "part and parcel of the collective bargaining process itself," and voluntarily withhold its undoubted authority to adjudicate alleged unfair labor practice charges involving the same subject matter, unless it clearly appears that the arbitration proceedings were tainted by fraud, collusion, unfairness, or serious procedural irregularities or that the award was clearly repugnant to the purposes and policies of the Act.

*Id.* at 926–27 (footnote omitted).

As this Court declared in *N.L.R.B. v. Pincus Bros., Inc.-Maxwell*, 620 F.2d 367 (3d Cir. 1980):

> Based on the Board's *Spielberg* doctrine, congressional action, and judicial decisions of the Supreme Court as well as this circuit, we conclude that it is an abuse of discretion for the Board to refuse to defer to an arbitration award where the findings of the arbitrator may arguably be characterized as not inconsistent with Board policy. In other words, "[i]f the reasoning behind an award is susceptible to two interpretations, one permissible and one impermissible, it is simply not true that the award was 'clearly repugnant' to the Act." *Douglas Aircraft Co. v. NLRB*, 609 F.2d 352, 354 (9th Cir. 1979).

620 F.2d at 374.

Since it is clear to me that the reasoning behind the arbitrator's award is susceptible to the interpretation that his decision not to grant backpay was a judgment by him that it would not be salutary to reward monetarily an employee who had "egregiously" interfered with production, I believe the Board should have deferred to that decision.[1]

Accordingly, I would not enforce the Board's order in this respect.

1. The only decision by the employer that was the subject of the proceeding before the NLRB was the discharge of Stritzinger when other employees with "clean" records were merely suspended. The employer did not order a discrete penalty of no backpay for Stritzinger, it simply discharged him. Since Stritzinger was reinstated before the NLRB proceeding, it is clear that it is the arbitrator's decision that Stritzinger not receive backpay that is the target of the Board's order. Since the arbitrator's decision is not, itself, an unfair labor practice, this would be an additional reason why the Board should have deferred to it.